**22-40587**

IN THE

# United States Court of Appeals

## FOR THE FIFTH CIRCUIT

◆◆

GIBSON BRANDS, INCORPORATED, A DELAWARE CORPORATION,

*Plaintiff-Appellee/Cross-Appellant,*

—v.—

ARMADILLO DISTRIBUTION ENTERPRISES, INCORPORATED, A FLORIDA CORPORATION; CONCORDIA INVESTMENT PARTNERS, LLC,

*Defendants-Appellants/Cross-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS

## BRIEF FOR DEFENDANTS-APPELLANTS/CROSS-APPELLEES

RONALD BIENSTOCK
SCARINCI HOLLENBECK, LLC
150 Clove Road
Little Falls, New Jersey 07424
(201) 896-4100

VIC HENRY
EMILEIGH S. HUBBARD
HENRY, ODDO, AUSTIN
  & FLETCHER, P.C.
1717 Main Street, Suite 4600
Dallas, Texas 75201
(214) 658-1900

*Attorneys for Defendants-Appellants/
  Cross-Appellees*

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5th CIR Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| Plaintiff-Appellee: | Counsel for Plaintiff-Appellee: |
|---|---|
| Gibson Brands, Incorporated | Stephen Howen \| Waco, TX |
| | Andrea Bates of Bates & Bates, L.L.C. Atlanta, GA |

| Defendants-Appellants: | Counsel for Defendants-Appellants: |
|---|---|
| Armadillo Distribution Enterprises, Incorporated<br><br>Concordia Investment Partners, LLC | Vic Henry of Henry, Oddo, Austin & Fletcher, P.C. \| Dallas, TX |
| | Emileigh Hubbard of Henry, Oddo, Austin & Fletcher, P.C. \| Dallas, TX |
| | Ronald Bienstock of Scarinci Hollenbeck, LLC \| Little Falls, NJ |

Respectfully submitted,

SCARINCI HOLLENBECK LLC

/s/ Ronald S. Bienstock
Ronald S. Bienstock
rbienstock@sh-law.com
150 Clove Road | 9th Floor
Little Falls, New Jersey 07424
Telephone:   (201) 896-7169
Facsimile:    (201) 896-7170

i

— and —

**HENRY ODDO AUSTIN & FLETCHER,**
**A PROFESSIONAL CORPORATION**

*/s/ Emileigh S. Hubbard*
Vic Houston Henry
TBA No. 09484250
vhhenry@hoaf.com
Emileigh Stewart Hubbard
TBA No. 24076717
ehubbard@hoaf.com
1717 Main Street, Suite 4600
Dallas, Texas 75201
Telephone:   (214) 658-1900
Facsimile:    (214) 658-1919

*Attorneys for Appellants Armadillo*
*Distribution Enterprises, Inc. and*
*Concordia Investment Partners, Inc.*

ii

## STATEMENT REGARDING ORAL ARGUMENT

Defendants-Appellants Armadillo Distribution Enterprises, Inc. and Concordia Investment Partners, LLC request oral argument because it will aid the Court's understanding of the complex issues presented and their context and will further allow the parties to address any concerns the Court may have regarding its review and determination of this matter.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................................ i

STATEMENT REGARDING ORAL ARGUMENT ............................................. iii

TABLE OF CONTENTS .................................................................................... iv

TABLE OF AUTHORITIES ............................................................................... vi

JURISDICTIONAL STATEMENT .......................................................................1

STATEMENT OF THE ISSUES.............................................................................2

STATEMENT OF THE CASE................................................................................4

    I.   FACTUAL OVERVIEW ..............................................................................4
    II.  FACTUAL BACKGROUND ......................................................................5
    III. RELEVANT PROCEDURAL HISTORY ...................................................9

       a.   *Armadillo's Motion for Summary Judgment ("MSJ")* ............................10
       b.   *Appellee's Opposition to the MSJ* ...........................................................11
       c.   *The District Court's MSJ Opinion* .........................................................12
       d.   *Appellee's Motion In Limine to Exclude Third-Party Use Evidence*.......12
       e.   *Jury Verdict and Omnibus Motion*...........................................................16

SUMMARY OF THE ARGUMENT ...................................................................19

ARGUMENT ......................................................................................................21

    I.   THE DISTRICT COURT ABUSED ITS DISCRETION IN EXCLUDING
       WHOLESALE EVIDENCE NECESSARY TO APPELLANTS'
       GENERICNESS CLAIMS AND DEFENSE OF APPELLEE'S CLAIMS
       WITHOUT LEGAL OR FACTUAL BASIS................................................21

       a.   *Standard of Review*.................................................................................21
       b.   *The District Court Abused Its Discretion in Excluding Substantial Third-Party Use Evidence Without Basis.*....................................................21
       c.   *The Exclusions Were Not Harmless Error and Substantially Prejudiced Appellants' Substantive Rights.*...............................................................30

II.  Plaintiff Failed to Show Likelihood of Confusion as a Matter of Law..........34

    *a.*    *Standard of Review*....................................................................34

    b.    *No Likelihood of Confusion Where Actual Confusion Does Not Exist, Despite Decades of Coexistence.* ...........................................35

III. Appellants Did Not Counterfeit as a Matter of Law. ....................................44

    *a.*    *Standard of Review*....................................................................44

    b.    *Use of Prominent Housemarks and Other Differentiating Features Preclude a Finding of Counterfeiting.* ......................................44

IV. Enjoining Appellants from Manufacturing, Advertising, or Selling the Dean V and Dean Z Was an Abuse of Discretion. .................................................50

    *a.*    *Standard of Review*....................................................................50

    b.    *Where Jury Found Laches and Substantial Prejudice, The Permanent Injunction Was an Abuse of Discretion.*...........................51

CONCLUSION ...................................................................................................56

CERTIFICATE OF SERVICE .............................................................................58

CERTIFICATE OF COMPLIANCE ....................................................................59

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*,
 280 F.3d 619 (6th Cir. 2002) ...............................................................23

*Abitron Austria GmbH v Hetronic Intl., Inc.*,
 21-1043, 600 U.S. _____, 2023 WL 4239255 (US June 29, 2023) ..................55

*Ale House Mgmt., Inc. v. Raleigh Ale House, Inc.*,
 205 F.3d 137 (4th Cir. 2000) ........................................................27, 28

*All for Good Gov't v. Coal for Better Gov't*,
 901 F.3d 498 (5th Cir. 2018) ........................................................35, 37

*Amazing Spaces, Inc. v. Metro Mini Storage*,
 608 F.3d 225 (5th Cir. 2010) ........................................................23, 30

*Amstar Corp. v. Domino's Pizza, Inc.*,
 615 F.2d 252 (5th Cir. 1980) ...................................................*passim*

*BellSouth Corp. v. White Directory Publishers, Inc.*,
 42 F. Supp. 2d 598 (M.D.N.C. 1999) ...............................................28

*Berg v. Symons*,
 393 F. Supp. 2d 525 (S.D. Tex. 2005)................................................29

*Bocanegra v. Vicmar Servs., Inc.*,
 320 F.3d 581 (5th Cir. 2003) ........................................................21, 31

*Braun Inc. v Dynamics Corp. of Am.*,
 975 F2d 815 (Fed Cir 1992) (*collecting cases*) ..................................44

*Brazos River Auth. v. GE Ionic, Inc.*,
 469 F.3d 416 (5th Cir. 2006) ...............................................................27

*Brooks v. Great Lakes Dredge-Dock Co.*,
 754 F.2d 539 (5th Cir. 1985) ...............................................................34

*Cairns v Franklin Mint Co.*,
  24 F Supp 2d 1013 (CD Cal 1998) (*collecting cases*) ........................................43

*CareFirst of Maryland, Inc. v First Care, P.C.*,
  434 F3d 263 (4th Cir 2006) ...........................................................................41, 42

*Conan Props. v. Conans Pizza, Inc.*,
  752 F.2d 145 (5th Cir. 1985) .........................................................................53, 54

*Converse, Inc. v. Int'l Trade Comm'n*,
  909 F.3d 1110 (Fed. Cir. 2018) ...................................................14, 22, 23, 29

*Diageo N. Am., Inc. v Mexcor, Inc.*,
  661 Fed Appx 806, 2016 WL 4586553 (5th Cir 2016) ......................................53

*Dupree v Younger*,
  143 S. Ct 1382 (2023) ........................................................................................34

*Elvis Presley Enters., Inc. v. Capece*,
  141 F.3d 188 (1998)......................................................................................*passim*

*Essence Communications, Inc. v Singh Indus.*,
  703 F Supp 261 (SDNY 1988) ...........................................................................44

*Feld Motor Sports, Inc. v. Traxxas, L.P.*,
  861 F.3d 591 (5th Cir. 2017) .................................................................34, 35, 44

*Feld Motor Sports, Inc. v Traxxas, LP*,
  No. 4:14-CV-543, 2015 WL 4610363 (ED Tex July 31, 2015)........................35

*Firefly Dig. Inc. v. Google Inc.*,
  817 F. Supp. 2d 846 ...........................................................................................23

*Future Proof Brands, L.L.C. v. Molson Coors Beverage Co.*,
  982 F.3d 280 (2020).....................................................................................36, 37

*Future Proof Brands, L.L.C. v Molson Coors Beverage Co.*,
  982 F3d 280 (5th Cir 2020) ...............................................................................47

*Gasoline Products v. Champlin Refining*,
  *283 U.A. 494, 500* ...............................................................................................*34*

vii

*George & Co. v. Imagination Ent. Ltd.*,
No. 1:07-cv-0498, 2008 WL 2883771 (E.D. Va. July 25, 2008),
*aff'd*, 575 F.3d 383 (4th Cir. 2009)......................................................................43

*Gibson Brands, Inc. v. John Hornby Skewes & Co.*,
No. CV 14-00609, 2016 WL 7479317 (C.D. Cal. Dec. 29, 2016)..............49, 52

*Gibson Guitar Corp. v. Paul Reed Smith Guitars*,
423 F.3d 539 (6th Cir. 2005) .........................................................................*passim*

*Herrington v. Hiller*,
883 F.2d 411 (5th Cir. 1989) ...............................................................................26

*In re Jasmin Larian, LLC*,
No. 87522459, 2022 WL374410 (TTAB 2022)...............................28, 29, 36, 37

*KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*,
543 U.S. 111 (2004).............................................................................................40

*Malaco Leaf, AB v. Promotion in Motion, Inc.*,
287 F. Supp. 2d 355 (S.D.N.Y. 2003) ............................................................23, 29

*Moore v Gibbs Const.*,
No. 95-60096, 1996 WL 101378 (5th Cir 1996)..................................................21

*Morgan v Mississippi*,
No. 2:07-cv-15, 2009 WL 3259233 (S.D. Miss. Oct. 8, 2009) ..........................25

*Nat'l Ass'n of Blue Shield Plans v. United Bankers Life Ins. Co.*,
362 F.2d 374 (5th Cir. 1966) ...............................................................................47

*New Century Fin., Inc. v. New Century Fin. Corp.*,
No. C-04-437, 2005 WL 2453204 (S.D. Tex. Oct. 4, 2005).............................24

*Oreck Corp. v. U.S. Floor Systems, Inc.*,
803 F.2d 166 (5th Cir. 1986) ........................................................................41, 47

*Peaches Entm't Corp. v. Entm't Repertoire Assocs., Inc.*,
62 F.3d 690 (5th Cir. 1995) ..........................................................................51, 52

*Petro Stopping Centers, L.P. v James Riv. Petroleum, Inc.*,
130 F3d 88 (4th Cir 1997) ...................................................................................41

*Planet Hollywood, Inc. v. Hollywood Casino Corp.*,
80 F. Supp. 2d 815 (N.D. Ill. 1999), *clarified*, 1999 WL 1186802
(N.D. Ill. 1999) ................................................................................................44

*Reuther v Realtors*,
No. 15-2850, 2016 WL 4592193 (E.D. La. Sept. 2, 2016) ................................25

*Sno-Wizard Mfg., Inc. v. Eisemann Products Co.*,
791 F.2d 423 (5th Cir. 1986) .............................................................................24

*Springboards to Educ., Inc. v. Houston Indep. School Dist.*,
912 F.3d 805 (5th Cir. 2019) .........................................................24, 29, 32, 33

*Stuart Spector Designs Ltd. v. Fender Musical Instruments Corp.*,
94 USPQ2d 1549, 2009 WL 1017284 (TTAB 2009) ....................27, 28, 29, 30

*Sun Banks of Fla., Inc. v. Sun Fed. Sav. & Loan Ass'n*,
651 F.2d 311 (5th Cir. 1981) .............................................................................47

*Sun-Fun Products, Inc. v. Suntan Research & Dev. Inc.*,
656 F.2d 186 (5th Cir. 1981) .............................................................................46

*Sun-Maid Raising Growers v. Sunaid Food Prods., Inc.*,
356 F.2d 467 (5th Cir. 1966) .............................................................................47

*Yurman Design, Inc. v. PAJ*,
262 F.3d 101 (2d Cir. 2001) .............................................................................23

**Statutes**

15 U.S.C. §§ 1051 *et seq.* ....................................................................................1

15 U.S.C. § 1114 ..................................................................................................9

15 U.S.C. § 1125(a) ..............................................................................................9

15 U.S.C. § 1127 ................................................................................2, 45, 50

28 U.S.C. § 1291 ..................................................................................................1

28 U.S.C. §§ 1331 ................................................................................................1

28 U.S.C. § 1332 ..................................................................................................1

28 U.S.C. §§ 1338(a) and (b) ........................................................................1

28 U.S.C. § 1367(a) and (b) ..........................................................................1

Lanham Act ..........................................................................................*passim*

Lanham Act Section 2(f) ..............................................................................23

**Other Authorities**

Federal Rule of Civil Procedure 50 .......................................................17, 34

Federal Rule of Civil Procedure 59(a) and (e) ............................................17

Federal Rule of Civil Procedure 60(a) and (b) ............................................17

Federal Rules of Evidence 403 .......................................................25, 26, 27

# JURISDICTIONAL STATEMENT

The District Court had (i) federal question jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1338(a) and (b) and Sections 39 and 43(a) and (c) of the Lanham Act (15 U.S.C. §§ 1051 *et seq.*,); (ii) diversity jurisdiction pursuant to 28 U.S.C. § 1332; and supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) and (b). (ROA.5786).

Appellants timely filed a Notice of Appeal on August 26, 2022 (ROA.5999–6002, ROA.6079–80). and timely filed its Amended Notice of Appeal on April 26, 2023, after the Court disposed of certain motions made by Appellants pursuant to Federal Rules of Civil Procedure (the "Rules") 50(b), 59(a), 59(e), and 60(a) and (b) (ROA.24741–42). This Court therefore has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.    Whether, in excluding all argument and evidence of third-party uses of Appellee's alleged product configuration marks and word marks for the periods from 1958 to 1992 and from 1997 to 2014 on the grounds of "judicial efficiency and possible confusion with the jury," the District Court abused its discretion and impaired Appellants' substantial rights (i) to present their counterclaims seeking cancellation of Appellee's alleged marks as generic and (ii) to present various defenses to Appellee's counterfeiting and infringement claims?

2.    Whether the District Court erred in finding that Appellants were not entitled to summary judgment or judgment as a matter of law that they had neither infringed nor counterfeited five alleged product configuration marks and one word mark, where Plaintiff failed to introduce *any* evidence of actual confusion for three of the produce configuration marks or the word mark, and failed to introduce any point-of-sale confusion evidence for two other product configuration marks that had been in the market for nearly sixty years when the litigation commenced?

3.    Whether the District Court erred in finding that Appellants were not entitled to summary judgment or judgment as a matter of law that they did not counterfeit any of Appellee's alleged marks where the court declined to consider— on the grounds that doing so would be inconsistent with the statutory definition of "counterfeit" in 15 U.S.C. § 1127— undisputed evidence (i) that all of Appellants'

2

allegedly counterfeit products were prominently branded with Appellants' housemarks and (ii) that the alleged product configuration marks were shapes incorporated into products with many other differentiating features?

4.     Whether the District Court abused its discretion in enjoining Appellants from manufacturing, advertising, or selling two guitar models, where (i) the jury found that laches applied and that Appellants suffered undue prejudice as a result, (ii) the District Court acknowledged that Appellee had delayed bringing a lawsuit for forty years, and (iii) the District Court ignored Appellants' briefing and extensive record evidence that, among other things, because the guitar models were critical to Appellants' history, its iconic brands, its customer base, and its endorsement relationships, enjoining them would cause substantial prejudice?

## STATEMENT OF THE CASE

### I.   FACTUAL OVERVIEW

This appeal arises out of a suit filed by Gibson Brands, Inc. ("Appellee") against Armadillo Distribution Enterprises, Inc. ("Armadillo") and Concordia Investment Partners, LLC ("Concordia," and together with Armadillo, "Appellants") to enforce Appellee's purported trademark rights in certain guitar body and headstock shapes and also two associated word marks.

The guitar body shapes at issue--the Flying V (U.S. Trademark Reg. No. 2051790), commonly referred to as a V shape, the Explorer (No. 2053805), commonly referred to as a Z shape, the ES (No. 2007277), and the SG (No. 2215791) (collectively, the "Body Shapes")—were introduced by Appellee in the late 1950s and 1960s but were widely utilized by numerous manufacturers before Appellee began to register them as marks in the late 1990s.  Indeed, when the Dean brand was founded by Dean Zelinsky ("Zelinsky") in January 1977, he introduced a V-shaped guitar (the "Dean V") and a Z-shaped guitar (the "Dean Z") that were inspired by Ibanez, another third-party manufacturer selling V and Z shaped guitars in the United States.

Given that the Body Shapes have been broadly utilized by dozens of manufacturers for over fifty years, Appellants counterclaimed for cancellation of the Body Shapes as generic. In support of its genericness counterclaims, Appellants

marshalled third-party advertising and sales evidence, obtained declarations, took deposition testimony from guitar manufacturer representatives, and engaged an expert to testify about the breadth and scope of third-party usage of the Body Shapes and the headstock at issue (the "Dove Wing Headstock" (No. 1020485), and together with the Body Shapes, the "Design Marks")—but the jury heard only a small sliver of what Appellants had prepared.

On the eve of trial, over vigorous objections, the District Court granted Appellee's motion *in limine* to exclude all evidence and arguments concerning third-party use of the Design Marks prior to 1992 and from 1997 to 2014. This wholly improper and unfounded ruling eviscerated (i) Appellants' genericness claims, which necessarily required demonstrating that the Body Shapes' broad and sustained use over time by a multitude of third-parties rendered the Body Marks incapable of acting as a source indicator and (ii) Appellants ability to defend against Appellee's infringement and counterfeiting claims as to the Design Marks, as generic marks are not entitled to protection under the law.

## II.    FACTUAL BACKGROUND

The Dean brand was founded in 1977 by Zelinsky (ROA.7510:22–24, 7543:17–19, 7736:07–12, 7736:18–7737:05), who introduced the Dean V and Z guitar models in January of that year (ROA.7508:15–24, 7510:17–7511:16, 7550:02–23, 7737:05–08, 7739:20–7740:04), after having been inspired by Ibanez

(another third-party manufacturer selling in the United States) V and Z shaped guitars. ROA.7512:22-7513:25, 7514:10-7516:07, 7517:25-7518:05).  Continuing throughout the 1980s, Dean guitars, including the V and Z, were sold in prominent retail stores (ROA7561:05–7562:02), played by popular artists (including, *e.g.*, Kerry Livgren of Kansas, ZZ Top, Def Leppard, and Nancy Wilson of Heart (ROA.7478:10–22, 7556:21–7560:09, 7753:24–7754:09, 7785:11–7786:12, 7788:01–7789:19, 9620(DTX-3902)), were prominently advertised (ROA.7478:23–7479:02, 7550:02–09, 7553:10–7555:20, 7555:25–7556:20, 7769:06–20, 8425:21–8426:09, ROA.9416(DTX-0303, 0304)), and were written about in numerous national publications and featured on MTV (ROA.7479:13–18, 7556:21–7560:09).

Zelinsky continuously offered and sold Dean guitars in the United States from 1977 through 1991, including V and Z guitars identical to the originals introduced in 1977. (ROA.7510:17–7511:23, 7526:21–7527:21, 7530:20–23). In 1991 the Dean brand and ongoing business were sold to Tropical Music Export Enterprises, Inc. (ROA.7528:01–03, 7563:10–13, 7567:25–7568:13, 7770:06–10, 9419(DTX-0324)). Throughout the period that it owned Dean, Tropical continued to use the Dean housemark in the United States on electric guitars, including on the V and Z shapes (ROA.7739:09–16, 7770:21–7771:06, 7772:08–7773:08, 7780:22–7781:02, 8116:16–20, 9419(DTX-0324 at ¶¶ 7–9, 11)), and it also continued to promote Dean

guitars (ROA.7569:03–10, 7780:20–7781:06, 8427:18–23, 9555(DTX-1699, 1700, 1701)).

In 1995, the Dean brand and ongoing business were purchased by Elliott Rubinson, the late founder and CEO of Armadillo, and ownership of Dean was ultimately structured under Appellants (ROA.7731:06–07, 7774:03–06, 7781:07–12, 12134–12135, 11384 at ¶¶31–32, 7770:11–17, 7825:14–25, 9555(DTX-1703, the uncontested 1996 Dean Catalog identifying Armadillo as Dean brand owner)). Rubinson's purchase was motivated by Dean's rich and iconic history, stretching back to the brand's inception in 1977. (ROA.7781:13–7782:04). From at least 1996 (when Armadillo took over manufacturing Dean guitars, including the V and Z) to the present, Armadillo has continuously offered and sold Dean V and Z guitars identical to and made to the same specifications as the guitars released in 1977. (ROA.7739:09–16, 7781:07–12, 7737:21–25, 7825.14–25, 9555–9557(DTX-1703, 1704, 1705, 1706, 1713, 1716, 1723, 1733), 9556(DTX-1750, 1753, 1763, 1768, 1773, 1771, 1793, 1796, 1797, 1798, 1800, 1801, 1802, 1808, 1823), 9561(DTX-1997)).

Since acquiring Dean, Armadillo has continuously promoted and leveraged the brand's history, especially that of the Dean V and Z, by (i) working with well-known artists (ROA.8198:14–8201:01, 8232:16–8233:10, 7323:22–7324:07, 7782:11–7783:18, 8227:16–8228:14, 9565-66(DTX-2155, 2157, 2164, 2167, 2168,

7

2177), 9558(DTX-1845, 1846, 1852), 9571(DTX-2267), 9615(DTX-3658)), (ii) advertising prominently and pursuing extensive media and social media coverage (ROA.9620(DTX-3909.2, 3910), 9561–9562(DTX-2063–2073), 9564–9565 (DTX-2132–2170), and (iii) manufacturing "throw-back" guitars (ROA.7785:02–10, 9573(DTX-2330)). As a result of Appellants' efforts, even 45 years after their introduction, the Dean V and Z remained commercial successes and integral to the Dean brand until Final Judgment was entered in this case. (ROA.9275:09–25, 9619(DTX-3858–3863), 9620(DTX-3944–3945)).

Dean was one of numerous guitar manufacturers who built out the market in the United States for the V- and Z-shaped guitars (ROA.7741:02–7742:05, 7842:21–7843:23) that are now generic due to widespread industry use (ROA.7741:02–7742:05). Having long-since allowed the Flying V and Explorer shapes to become generic, Appellee now seeks to appropriate the entirety of the market that other parties' efforts and investments largely created. Moreover, Appellees seek to do the same for guitars bearing the ES and the SG body shapes, which Armadillo began to utilize in 2013, but which many other third-party manufacturers have been making *en masse* since the 1960s.

8

### III.    RELEVANT PROCEDURAL HISTORY [1]

Appellee brought claims for willful trademark infringement under the Lanham Act (15 U.S.C. § 1114) and Texas common law; willful counterfeiting under the Lanham Act (*id.*); false designation of origin, passing off, and unfair competition under the Lanham Act (15 U.S.C. § 1125(a)) and Texas common law; and unjust enrichment. The Appellee requested damages and a permanent injunction prohibiting further infringement. (ROA.5786–5788).

Appellants answered that Appellee's knowledge of the Dean brand since the late 1970s and of Armadillo from the mid-to-late 1990s on substantially barred Appellee's claims under the doctrine of laches; that there was no likelihood of consumer confusion because the Design Marks were generic or at least commercially weak after decades of extensive third-party; and that the parties sold *guitars* with distinctive identifying housemarks, headstocks, and other differentiating features—not just body shapes—such that neither infringement nor counterfeiting could be found as a matter of fact or law. Appellants also brought counterclaims seeking cancellation of the Body Shapes' respective trademark registrations because the Body Shapes are generic. (ROA.5790–5794).

---

[1]    Much of the extensive litigation that occurred is not germane to this Appeal. For efficiency of review, the facts and legal arguments presented herein focus principally on the legal issues raised herein. Appellants stand ready to supplement this brief upon request.

a. *Armadillo's Motion for Summary Judgment ("MSJ")*

Following the close of discovery, Armadillo moved for summary judgment, including because all of Appellee's claims were barred by laches; Appellee could not establish likelihood of confusion for any of the Alleged Marks; and Appellee's counterfeiting claims were unsupportable as a matter of law when the products utilizing the Alleged Marks were viewed in commercial context. (ROA.11438–12258).

Following  the "digits of confusion" analysis (the "Digits Factors") that is well-established in the Fifth Circuit (*see* Arg. Section II *infra*), the MSJ argued that (i) Appellee's marks were commercially weak (ROA.11422–11425, 16354–16355), (ii) Armadillo's guitars were always sold with its DEAN and LUNA housemarks and headstocks prominently displayed (ROA.11425–11427,16355–16357), (iii) while Appellants' nationwide consumer survey evidence showed no confusion, Appellee failed to present any confusion survey evidence and the record was essentially devoid of actual confusion evidence (ROA.11427–11429, 16359–16361), and (iv) guitar purchasers are sophisticated consumers long accustomed to distinguishing between guitars of varying manufacture with similar or identical body and headstock shapes (ROA.11429–11430, 16361).

The MSJ argued that Appellants did not counterfeit the Alleged Marks as a matter of law because the undisputed facts showed that the guitars utilizing marks

substantially similar to the Alleged Marks were prominently branded with the Dean and Luna housemarks and were incorporated into product configurations that were otherwise dissimilar from Appellee's products. (ROA.11430–11434).[2]

    b. *Appellee's Opposition to the MSJ*

In response to the MSJ's likelihood of confusion arguments, Appellee emphasized[3] the digits favoring Appellee were not in dispute: Armadillo's body shapes are "identical or at least substantially similar" (ROA.15011–15013), the products are the same (ROA.15013), and the products are sold and advertised via the same channels (*id.*). Appellee's actual confusion evidence was, at best, negligible, consisting of an Appellee employee's brief confusion about the source of a guitar used by an artist onstage; an Appellee salesperson recalling unidentified customers and sales associates who may have experienced temporary confusion; and an unaffiliated salesperson's testimony that unidentified customers had wondered

---

[2]  Appellee's "chief historian" (ROA.7156:18–22) testified that (i) he could not identify a guitar's manufacturer by shape alone but utilized a guitar's housemarks and/or serial number for identification (ROA.7168:05–17) and (ii) a counterfeit guitar would have to bear Appellee's GIBSON mark (ROA.7046:09–24 ("So you envision counterfeit to also say the word 'Gibson' on the guitar?" "Yeah.")).

[3]  Appellee also argued here and throughout the matter that Armadillo acted in bad faith through Zelinsky's actions in 1977, while asserting that Appellants could not rely on Zelinksy's use of the Dean V and Z, which is inherently inequitable. Furthermore, the intent to deceive consumers is the relevant measure of bad faith, and the evidence Appellee cited showed an intent to compete with Appellee, not to deceive anyone as to the source of Dean-branded guitars. (*Compare* ROA.15013-15024 with ROA.16357-16359.)

whether Dean and Appellee might be affiliated (ROA.15024–15025). Regarding counterfeiting, Appellee merely pressed the legal argument that comparing marks in isolation rather than the goods into which they are incorporated is the only salient comparison, but did not dispute the factual predicates supporting Appellants' analysis. (ROA.15312–15318). Since the facts were undisputed, the counterfeiting claims were ripe for adjudication on summary judgment.

### c. *The District Court's MSJ Opinion*

The District Court's entire analysis of Armadillo's MSJ arguments was as follows: "the Court is not convinced that Armadillo met its burden demonstrating that there is no material issue of fact as to these claims entitling it to judgment as a matter of law." (ROA.3133) The District Court's order did not identify a single disputed fact that might have prevented summary judgment.

### d. *Appellee's Motion In Limine to Exclude Third-Party Use Evidence*

Days before trial, the District Court heard arguments on Appellee's omnibus motion *in limine* ("OMIL," ROA.18142–18825), including the OMIL's sixth motion ("MIL6," ROA.18120–18123) to exclude all arguments and evidence relating to "advertisements or sales of third-party guitars prior to 1992" and from 1997 to 2014 (the "Exclusions"). MIL6 claimed in conclusory fashion that such evidence's "limited probative value" was "substantially outweighed by unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, and needlessly

presenting cumulative evidence" [*sic*]. (ROA.18122). Appellee argued for the 1992 cut-off based on the unsupported and unsupportable claim that 1992 was five years before Armadillo acquired the Dean brand from Tropical (ROA.18120)—whereas clear evidence definitively establishes that Armadillo's acquisition and first uses of certain disputed marks occurred earlier. (*See* ROA.12134–12135 (*collecting* evidence), *see also* ROA.11384 at ¶¶ 31–32, 7731:06–07, 7770:11–17, 7774:03–06, 7825:14–25, 9555(DTX-1703, the uncontested 1996 Dean Catalog identifying Armadillo as Dean brand owner, DTX-1704))

Appellants opposed MIL6 on multiple grounds. First, the District Court had previously ruled that "[e]vidence of third-party use is highly relevant and imperative to [Appellants'] case against [Appellee's] affirmative claims *and* [Appellants'] affirmative claims of genericness." (ROA.20119, *citing* the District Court's previous rulings that third-party evidence was "at the core of Armadillo's argument that [Appellee's] marks are generic" and "necessary to Armadillo's defense" (ROA.2852, 2905–2906)). Additionally it was argued that there is no legal authority that holds that third-party use evidence that predates a competitor's market entry is not relevant for evaluating genericness or the strength of a mark. (ROA.20119–20121). The fact remains that this evidence is highly relevant for demonstrating that consumers' attention has been trained for decades to recognize "minute distinctions" between guitars in order to determine their brand. As such, the Design Marks would

only be "entitled to a narrow scope of protection, if any" (ROA.20122). Fourth, the District Court previously held that the jury would determine Appellants' use date for the Dean V and Z (i.e., whether it began with Appellants in 1995 or when Zelinsky began selling Vs and Zs (ROA.20120); and (v) the volume of third-party use evidence did not constitute "unfair prejudice" (ROA.20122). Appellants attached to its opposition deposition testimony excerpts from third-party guitar manufacturers regarding use of the Body Shape designs for decades prior to 1997. (ROA20149–20265).

The District Court's order ("Exclusion Order 1," ROA.5806-5809) granting MIL6 acknowledged Fifth Circuit precedent supporting the relevance of the Exclusions to genericness (ROA.5808) but nonetheless granted MIL6, misapplying a Federal Circuit case where genericness *was not even at issue*. (ROA.5808, *discussing Converse, Inc. v. Int'l Trade Comm'n*, 909 F.3d 1110, 1120 (Fed. Cir. 2018), which analyzed evidentiary issues related to *secondary meaning*). Exclusion Order 1 did not address the Exclusions' probative value, explain any purported concerns regarding jury "confusion", or explain why the *Converse* case should apply in the genericness context at all.  Adoption of the 1992 cut-off also implicitly (and improperly) made a factual determination as to the date of Armadillo's first use of

the Dean V and Z, contrary to the District Court's prior reservation of that question for the jury.[4]

Appellants immediately objected, and the District Court heard additional oral arguments where Appellants reiterated that one must "look at the whole history" of a mark's use to determine whether there have been "so many third-party uses" that a mark's "trademark significance" has been "destroyed" and it has become generic. (ROA.6395:22–6396:03, *see also* 6396:04–6397:14, 6397:21–24, 6400:23–6403:09, *presenting* third-party use evidence and maintaining such evidence was critical for showing that the "scores of third parties" using Body Shapes since their introduction, including '70s, '80s, and '90s, which rendered the shapes generic), 6404:02–25, 6431:14–6432:23, 6436:06–6437:04, 6437:12–6438:23).

Following the supplemental oral arguments, the District Court issued a second order ("Exclusion Order II") upholding its MIL6 ruling, without mentioning genericness, because "concerns regarding judicial efficiency and possible confusion with the jury compel[led]" adherence "to a cut-off date." (ROA.5816). During trial Appellants made a formal offer of proof (the "Offer," ROA.5854–58, 8260:24–25) identifying testimony from seven witnesses and two hundred fifty-eight (258)

---

[4]   In its MSJ opposition, Appellee cited a TTAB order that indicated a 1997 first-use date for an Armadillo headstock as evidence that Armadillo purchased the Dean brand in 1997, without explanation as to why the former has any bearing on the latter. (ROA.15419 (Exhibit K); 15278; 15393 at ¶ 74, citing Exhibit K).

exhibits regarding third-party use that would have been introduced at trial. The Offer explained again that this evidence "would have been relevant to . . . the unprotectability (*vis a vis* genericness) and weakness of Appellee's asserted guitar and headstock shapes." (ROA.5856).

     e. *Jury Verdict and Omnibus Motion*

Following a nearly 50-hour trial, the jury found that Appellants infringed all of the Design Marks and HUMMINGBIRD; that it sold or marketed "counterfeits" of the Flying V, Explorer, SG, and HUMMINGBIRD; and that its infringement of the Body Shapes and HUMMINGBIRD was willful. In considering laches, the jury found that Appellee delayed in asserting its trademark rights in the Flying V, the Explorer, and the Dove Wing Headstock; that this delay was unreasonable and caused Appellants undue prejudice; and that Appellants did not have unclean hands with respect to those marks. The jury found that Appellee had not proved *any* compensatory damages and awarded only $4,000 in statutory damages for counterfeiting ($1,000 for each mark). The jury did not find that any of the Body Shapes should be cancelled. (ROA.5922–5933).

After additional briefing, wherein Appellants explained that laches should bar issuance of a permanent injunction and the dire consequences for both the Dean brand and Appellants if an injunction issued  (ROA.23378-23781). Thereafter, the Court entered a Final Judgment (ROA.5999–6002) and supporting opinion

(ROA.5976–5998). The Final Judgment permanently enjoined Appellants from manufacturing, selling, or advertising the Body Shapes and HUMMINGBIRD (or contributing to same).

Appellants timely filed their post-trial motion for relief pursuant to FRCP 50(b), 59(a), 59(e), and 60(a) and (b) (the "Omnibus Motion") (ROA.24258-24327), raising substantially similar arguments to those presented in the MSJ regarding likelihood of confusion and counterfeiting. (ROA.24270–24279). The Omnibus Motion also moved for a new trial on the grounds that the Exclusions "severely prejudiced" Appellants by preventing them from "presenting to the jury critical evidence regarding the genericness of Appellee's marks over decades" (ROA.24317) and moved for vacatur of the Final Judgment's permanent injunction (ROA.24298-24314).

The District Court denied the Omnibus Motion in its entirety. (ROA.24670–24728). In rejecting Appellants' motion for judgment as a matter of law because Appellee failed to demonstrate likelihood of confusion, the District Court acknowledged that Appellee's "evidence of actual confusion" was "relatively limited" (ROA.24706) but nevertheless mechanically tabulated four Digits Factors that Appellants had purportedly "conceded" (i.e., mark similarity, product similarity, retail outlet identity, media channels identity (ROA.24706)) and concluded that those four factors sufficed to support the verdict.

17

On counterfeiting, the District Court recognized that the issue presented reduced to the purely legal question of "[w]hat constitutes a 'counterfeit'" (ROA.24716) but asserted (incorrectly) that the Fifth Circuit has never considered whether a counterfeiting determination must be made with regard to how the marks are presented in the marketplace. (ROA.24717). Hewing to an exceedingly narrow and literal interpretation of the text of the Lanham Act, the Court held that it would be contrary to the statutory definition of "counterfeit" to consider a broader market context of the product into which a product configuration mark was incorporated. (ROA.24720).

Regarding the denial of Appellant's motion for a new trial based on the MIL6 ruling, the District Court stated simply: "For the reasons discussed in its prior orders, *the [District] Court does not think this evidence was relevant to the claims at issue in this case*." (ROA.24725, emphasis added). And the District Court declined altogether to address Appellants' motion to vacate the permanent injunction. (ROA.24727-24728).

## SUMMARY OF THE ARGUMENT

The District Court's conclusory decision on the eve of trial to exclude Appellants' principal third-party use evidence, the lynchpin of both Appellant's affirmative claims to cancel Appellee's Body Shapes as generic, was without any legal basis or any evaluation of the prejudicial impact to Appellants' substantive rights. Having issued two opinions on the matter, the District Court's lone justifications were reliance on a Federal Circuit case that does not mention genericness and a conclusory statement that judicial efficiency and jury confusion compelled the decision. The relevant opinions contained no factual findings or analysis. Accordingly, the decision to exclude this critical third-partly evidence constituted an abuse of discretion that affected Appellants' substantive rights, and the Court should order a new trial.

Appellants also argue that the near-total absence of actual confusion evidence for marks that have co-existed in the marketplace for decades should be deemed not to have a likelihood of confusion as a matter of law. In the product configuration context, where the preservation of competition is a central concern and four of the eight relevant factors tend to automatically favor a finding of likelihood of confusion, the absence or near-total absence of actual confusion evidence for marks that have coexisted for years or decades should be dispositive that likelihood of confusion does not exist. Appellants further argue that, in the product configuration

context, a product incorporating a potentially infringing product configuration feature cannot be deemed a counterfeit as a matter of law where the allegedly infringing product prominently display its own source's housemarks, headstock, and other differentiating trade dress features. The Court should therefore find for Appellants on both of these points as a matter of law.

Finally, Appellants argue that, where a jury has found that laches apply because the owner of a mark waited approximately forty years before bringing suit, and the infringing party has made a significant showing that issuance of an injunction to enjoin the infringing product would plainly cause substantial harm, it is an abuse of discretion to ignore that showing and enjoin the infringing product. The Court should remand the District Court to modify the Final Judgment such that the Dean V and Z are no longer enjoined.

# ARGUMENT

## I. THE DISTRICT COURT ABUSED ITS DISCRETION IN EXCLUDING WHOLESALE EVIDENCE NECESSARY TO APPELLANTS' GENERICNESS CLAIMS AND DEFENSE OF APPELLEE'S CLAIMS WITHOUT LEGAL OR FACTUAL BASIS.

### a. *Standard of Review*

"A trial court abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence." *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir. 2003) (internal citations omitted). "If . . . an abuse of discretion in admitting or excluding evidence" is found, the judgment will be affirmed "under the harmless error doctrine" unless "the ruling affected substantial rights of the complaining party." *Id.*

### b. *The District Court Abused Its Discretion in Excluding Substantial Third-Party Use Evidence Without Basis.*

The District Court abused its discretion in granting MIL6 (ROA.5806) because the wholesale exclusion of critical third-party use evidence was based on an erroneous interpretation of law and was made without regard to the vital importance of the excluded evidence. *See Moore v Gibbs Const.*, No. 95-60096, 1996 WL 101378, at *5 (5th Cir 1996) (wholesale exclusion of evidence requires careful review as they create artificial and unreasonable results) (citation omitted)).

Appellants consistently maintained that third-party use evidence before 1992 and from 1997 to 2014 was central to their efforts to establish their claims, including

genericism. The District Court's rationales for the Exclusions, however, have varied—but none have merit.

The District Court initially construed MIL6 as requesting the Exclusions because third-party use evidence prior to 1992 and from 1997 to 2014 was "too attenuated to be relevant to this case[] and would likely confuse the jury." (ROA.5806).[5] In Exclusion Order I the District Court granted the Exclusions based on a clear misapplication of *Converse, Inc. v. Int'l Trade Comm'n*, 909 F.3d 1110 (Fed. Cir. 2018) (see ROA.5808, *quoting Converse*, 909 F.3d at 1121), which established a presumption in trade dress infringement cases that third-party uses within five years of the first alleged infringing use are most relevant for purposes of a "secondary meaning analysis." *Id.* at 1120–21.[6]

As Appellants argued below, the *Converse* decision "involved secondary meaning, not genericness. Secondary meaning is very different." (ROA.6395:01–

---

[5]   At trial, the District Court permitted Appellee to introduce evidence concerning settlement agreements with third parties from the 1970s. (ROA.7013:03–7014:04; 9397(Exhibit 155)). This further enabled Appellee to create a counterfactual illusion that Appellee was actively policing its purported marks in a limited universe of third-party use, whereas in reality, third-party use was rampant.

[6]   Even if reliance on *Converse* were appropriate here, which it is not, the District Court *still* misapplied that case. Appellants were prepared to present ample evidence that older third-party uses of the Design Marks had affected consumer perceptions as of the date of either Armadillo's first alleged infringement or the dates of the Body Shapes' respective registrations. (ROA.20577–20578.) The *Converse* Court, in fact, noted that Section 2(f) of the Lanham Act "cannot be read as limiting the inquiry to the five years before the relevant date." *Converse*, 909 F.3d at 1121; *see also* ROA.20580 (same).

04, *accord Amazing Spaces*, 608 F.3d at 241–42 ("[G]eneric marks may never acquire secondary meaning and are categorically excluded from protection.")). Indeed, in *Malaco Leaf, AB v. Promotion in Motion, Inc.*, 287 F. Supp. 2d 355 (S.D.N.Y. 2003), the court noted that "even a showing of secondary meaning is insufficient to protect product designs that are overbroad or generic." *Id.* at 364 (*quoting Yurman Design, Inc. v. PAJ*, 262 F.3d 101, 115 (2d Cir. 2001)), *see also Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 638 (6th Cir. 2002) (*finding* generic product configurations unprotectable despite secondary meaning evidence because "no designer should have a monopoly on designs regarded by the public as the basic form of a particular item").[7]

The District Court never offered *any* explanation for its erroneous reliance on *Converse* despite Appellants having shown that historical third-party use evidence has repeatedly been deemed relevant to a genericness determination. (*See, e.g.*, ROA.20579-20580, *citing Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 259–60 (5th Cir. 1980) (*finding that* excluding "long abandoned" third-party uses dating back to 1885 was error where mark was registered in 1901, defendant's first use was in 1965, and the litigation began in 1975), *Firefly Dig. Inc. v. Google Inc.*, 817 F.

---

[7]   The *Abercrombie* court's concern is well taken. The injunction barring Appellants from manufacturing, advertising, and selling the Dean V and Z, flagship products for Dean and Armadillo, will inevitably have a chilling effect across the guitar industry and confer upon Appellee a monopoly on these generic shapes that it long ago abandoned to the marketplace.

Supp. 2d 846, 857–58 (*evaluating* third-party uses dating to 1999 where plaintiff's first use was in 2002, registration in 2009, and litigation commencement in 2010); *New Century Fin., Inc. v. New Century Fin. Corp.*, No. C-04-437, 2005 WL 2453204, at *5–6 (S.D. Tex. Oct. 4, 2005) (*finding* error in magistrate's "discounting [third-party uses] on summary judgment" and that the "probative value of third-party uses" is "for the fact-finder to weigh").

Moreover, the District Court's conclusory evaluation of the Exclusions' evidentiary value in Exclusion Order I—that "the probative value of evidence before the 1990s [was] low"—was contrary to the District Court's own prior assessments of the exact same evidence. (*See* ROA.2852, granting emergency motion to conduct third-party depositions because "third-party sales data *are at the core of Armadillo's argument that [Appellee's] marks are generic*" and "therefore *necessary to Armadillo's defense*") (emphasis added), ROA.2906, denying Appellee's motion to strike Appellants' expert report because "[Appellants'] theory that Appellee's guitar shapes are generic *requires a showing of widespread use of the guitar shape by competitors in the market*" and the report added data "demonstrate[ing] the prevalence of Appellee's guitar shape in the market" (emphasis added); *see also* ROA.5808, acknowledging in Exclusion Order I that evidence pre-dating the period at issue in the litigation was "relevant to whether the marks have become generic" under this Circuit's decision in *Springboards to Educ., Inc. v. Houston Indep. School*

*Dist.*, 912 F.3d 805, 815 (5th Cir. 2019) ("*Springboards*")). Neither Exclusion Order I nor II attempted to explain why the District Court had come to adopt a position squarely at odds with its prior holdings regarding the highly probative value of third-party use evidence for Appellants' genericness claims and defense.[8]

After Appellants objected to the Court's Exclusion Order I decision and again argued that this evidence was essential, the District Court upheld its MIL6 decision in Exclusion Order II because "concerns regarding judicial efficiency and possible confusion with the jury compels [*sic*] the [District] Court to adhere to a cut-off date it has found reasonable." (ROA.5816). The District Court did not make a single finding in support of this statement, adding only (and, again, inexplicably) that the Exclusions would not impair Appellants' laches defense. (ROA.5808).

To the extent that Exclusion Order II implies that the Exclusions were made pursuant to FRE 403, they remain an abuse of discretion. Neither MIL6 nor the Exclusion Orders explain what confusion the District Court believed the jurors might

---

[8]    The District Court compounded this error by uncritically adopting Appellee's 1992 cut-off base on Appellee's unsupported (and unsupportable) claim that Armadillo purchased Dean in 1997. (*See* Section III.d. pg. 14 *supra*) This aspect of the Court's decisions in both Exclusion Orders was tantamount to a finding of fact regarding Armadillo's first sales of the Dean V and Z. (*See* n.4 *supra*) But motions in limine cannot substitute for a motion for summary judgment or a motion for directed verdict, and relief that may be appropriate in response to the latter kinds of motion is itself an abuse of discretion when granted in response to a motion *in limine*. *See, e.g.*, *Reuther v Realtors*, No. 15-2850, 2016 WL 4592193, at *2 (E.D. La. Sept. 2, 2016); *Morgan v Mississippi*, No. 2:07-cv-15, 2009 WL 3259233, at *1 (S.D. Miss. Oct. 8, 2009).

have experienced or the nature of the undue administrative burden that could warrant

such an extreme measure. And Appellee did not seriously try to make the case that

the Exclusions were warranted under FRE 403 in its MIL, either. Appellee's *entire*

FRE 403 argument in MIL6 states:

> Not only is much of the evidence cumulative but is it [*sic*] unlikely the jurors will sift through every single advertisement or sale in detail, so the volume alone would lead a juror to accept them as supportive of [Appellants'] arguments despite whether or not [*sic*] the magazines or sales are actually showing what [Appellants] purports them to [*sic*]. Such inferences would be highly prejudicial to [Appellee].

ROA.18122-18123 (internal citations omitted).

Appellee's odd fusion of self-serving, conclusory assertions and an abstract

concern that the jury might not draw appropriate conclusions falls woefully short of

the kind of FRE 403 showing that would need to be made for the exclusion of a

substantial share of the evidence at the heart of Appellant's case. *See Herrington v.*

*Hiller*, 883 F.2d 411, 414 (5th Cir. 1989) ("Because rule 403 permits the exclusion

of probative evidence it is an extraordinary remedy that must be used sparingly."

(internal quotation marks omitted)). Here, the nature of the purported "unfair

prejudice" was never articulated.[9] Moreover, the fact that there is *so much* third-party

---

[9]    Appellee's argument seems to be that a significant volume of non-cumulative third-party advertising and sales evidence could lead the jury to infer that Appellants' third-party use arguments were well supported; but neither a factual nor legal showing was made here to compel the conclusion that the offer evidence would be *unfairly* prejudicial, as is required.

use evidence prior to 1992 and from 1997 to 2014 is precisely why that evidence is critical for showing the Design Marks' genericness. *See Brazos River Auth. v. GE Ionic, Inc.,* 469 F.3d 416, 427 (5th Cir. 2006) ("Unfair prejudice as used in rule 403 is not to be equated with testimony that is merely adverse to the opposing party. Virtually all evidence is prejudicial; otherwise it would not be material. The prejudice must be 'unfair.'").

The TTAB case *Stuart Spector Designs Ltd. v. Fender Musical Instruments Corp.*, 94 USPQ2d 1549, 2009 WL 1017284 (TTAB 2009) ("*Spector*") is a compelling illustration of why a fulsome consideration of third-party use evidence is essential to a genericness analysis. In *Spector*, Fender, another well-known guitar manufacturer applied in 2003 to register certain guitar body shapes it had been making since the 1950s, as trademarks. *Spector* asserted the principle that, "[i]n the context of product design, genericness may be found where the design is . . . so common in the industry that it cannot be said to identify a particular source." *Id.* at *6; *see also Ale House Mgmt., Inc. v. Raleigh Ale House, Inc.*, 205 F.3d 137, 142 (4th Cir. 2000) ("Trade dress should be considered generic if well-known or common . . . or a common basic shape or design"). *Spector* further explained that a genericness analysis is particularly important in the product design context because claims for trademark protection of trade dress "present an acute risk of stifling competition"—"granting trade dress protection to an ordinary product design . . .

create[s] a monopoly in the goods themselves." *Id.* (internal quotation marks omitted). In finding that Fender's guitar body shapes were generic, the *Spector* board considered evidence and testimony regarding the shapes that went back 50 and 60 years. *See Spector* at *8 (quoting testimony that the shapes at issue had "become traditional shapes over the last 50 years"; *id.* at *12 (*quoting* testimony asking rhetorically, "Why after 60 years would I be asked to change a body style?"); *see also In re Jasmin Larian, LLC*, No. 87522459, 2022 WL374410, at *7 (TTAB Jan. 19, 2022) (finding genericness where the "Examining Attorney has presented substantial evidence that third parties have sold, offered for sale, and/or otherwise advertised, discussed or promoted identical or nearly identical hand bags prior to and concurrently with Applicant's use [beginning on January 27, 2013], and that consumers have seen identical or nearly identical handbags emanating from parties other than Applicant since at least the 1940s and recognize Applicant's mark as a common design"); *BellSouth Corp. v. White Directory Publishers, Inc.*, 42 F. Supp. 2d 598, 610 n.5 (M.D.N.C. 1999) (where plaintiff's predecessor had permitted use of "walking fingers" logo on phone books, stating that plaintiff could not "turn[] on its head over thirty years of history by now seeking trademark protection"). Based on evidence of extensive third-party use over many decades, the *Spector* Board found that Fender's guitar shapes were generic. The jury in the instant case should

have been presented with the same kind of third-party use evidence so that it could determine whether the same outcome was warranted here.

Finally, in rejecting Appellants' motion for a new trial, the Omnibus Opinion asserted an entirely new rationale for the Exclusion: "[f]or the reasons discussed in its prior orders, the District Court does not think this evidence *was relevant to the claims at issue* in this case." (ROA.24725 (emphasis added)). The rationale that the excluded third-party use evidence is *not relevant* to Appellant's genericness claims and defenses was certainly not stated in the Exclusion Orders, and it is absolutely untenable to maintain that a long and robust history of third-party use has no relevance to the evaluation of genericness. *See Amstar Corp.*, 615 F.2d at 259–60; *Malaco Leaf*, 287 F. Supp. 2d at 364; *Jasmin Larian*, 2022 WL374410 at *7; *Spector*, 2009 WL 1017284 at *6; *see also Springboards*, 912 F.3d at 815 ("Extensive third-party use of a term throughout the market suggests that consumers will not associate the junior user's mark with the senior mark user"); *Berg v. Symons*, 393 F. Supp. 2d 525, 555 (S.D. Tex. 2005) ("A design may be generic if it is so common in the industry that it is incapable of serving to identify one particular source")).

For the foregoing reasons, (i) the District Court misapplied *Converse* in relying on that case as a basis for the Exclusions in Exclusion Order I; (ii) it made no findings in either Exclusion Order as to how concerns regarding judicial

administration or potential prejudice caused by jury confusion outweighed the probative value of the excluded evidence such that the heart of Appellants' case should be excluded; and (iii) the District Court's assertion that the excluded evidence is not relevant is pervasively contradicted by case law and by the District Court's own prior orders. The District Court therefore abused its discretion preventing Appellants to utilize the Exclusions at trial.

c. *The Exclusions Were Not Harmless Error and Substantially Prejudiced Appellants' Substantive Rights.*

The Exclusions pervasively prejudiced Appellants' ability to try their genericness counterclaims as to the Body Shapes and their defenses against Appellee's counterfeiting and infringement claims as to all of the Design Marks— Appellants were left without substantial means to prove that they have no liability because generic marks are not entitled to protection as a matter of law. *See Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 241–42 (5th Cir. 2010) ("[G]eneric marks may never acquire secondary meaning and are categorically excluded from protection.").

It is impossible for a factfinder to fairly and reliably evaluate the strength of a mark in the marketplace if the lion's share of relevant marketplace evidence is excluded from consideration. *See Amstar*, 615 F.2d at 259 (strength of the mark is "a vital consideration in determining the scope of protection"); *Spector*, 2009 WL 1017284 at *6 ("In the context of product design, genericness may be found where

30

the design is . . . so common in the industry that it cannot be said to identify a particular source.") Since the excluded third-party evidence was the principal way for Appellants to prevail in this case, its improper exclusion cannot be harmless error. *See Bocanegra*, 320 F.3d at 584 (finding that improper exclusion of vehicle operator's marijuana use, including on grounds of unfair prejudice, affected plaintiff's substantial rights because "the jury was prevented from even considering the critical issue of whether [the] marijuana use affected [defendant's] ability to react appropriately").

The Exclusions bear directly on the jury's assessment of the strength of the mark. (ROA.5904, instructing jurors to analyze "the standing of the mark in the marketplace (commercial strength)" and noting that the "greater number of more or less similar trademarks already in use on different kinds of goods, the less is the likelihood of confusion")). Appellants' expert testified in discovery, and Appellee's experts testified similarly, that there have been at least 36 manufacturers who have used the V body shape and 26 manufacturers who have used the Z body shape on guitars since the mid-1970s; at least 34 manufacturers who have used the SG body shape and 56 who have used the ES-335 body shape since the 1960s; and dozens of manufacturers have used headstocks with features similar to or identical with those that Appellee claims for its headstock. (ROA.11424, citations omitted). Preventing the jury from seeing decades of sales and advertising evidence of the contested

shapes by numerous manufacturers utilizing the Design Marks inevitably impaired the jury's ability to weigh Appellants' genericness claims and defenses fairly.

The effects of the Exclusions, however, extend far beyond the jury's evaluation of genericness and strength of the Design Marks. "In assessing likelihood of confusion," the Fifth Circuit "examine[s] eight nonexhaustive 'digits of confusion'" (*Springboards*, 912 F.3d at 812); and evaluation of several of those digits is improperly skewed by the District Court's having unfairly tilted the playing field in favor of Plaintiff, allowing Appellee to present decades of evidence related to *its* use of the Flying V and the Explorer (pre-1977) and of the SG (pre-1992) and the ES (pre-1992) in a vacuum.

For example, one digit of confusion is "the defendant's intent." (*Springboards,* 912 F.3d at 812). Appellee contended that Zelinsky, the founder of the Dean brand, acted with bad faith when he designed his Dean V and Z guitars in 1977, implying that he intended to profit from the deceptive use of Appellee's mark. Zelinsky testified that when he designed them, he utilized Ibanez V- and Z-shaped guitars for inspiration, not Appellee's. (ROA.7512:22-7513:25, 7514:10-7516:07, 7517:25-7518:05). How could the jury properly evaluate that statement, or the credibility of the witness, when evidence that these manufacturers had been making V- and Z-shape guitars for years was barred?

32

Another digit is "evidence of actual confusion" (*Springboards*, 912 F.3d at 812). How could the jury properly weigh Appellants' expert's survey evidence showing that there was no confusion, or the fact that Plaintiff's expert *declined to even ask* those surveyed about confusion (ROA.8836:05–11, 2336:04–2373:06), without understanding that many manufacturers had been making the Body Shape for decades? And two other digits, "identity of the retail outlets and purchasers" and the "degree of care exercised by potential purchasers" (*Springboards*, 912 F.3d at 812), go to defining the relevant group of consumers and assessing their sophistication. How are these factors to be evaluated if the jury is not aware that the musicians, collectors, and fans who purchase these guitars have had to distinguish among numerous guitars with similar or identical shapes made by an array of manufacturers since they were first introduced? The absence of decades of third-party use evidence certainly affected the jury's determination that Armadillo acted willfully.

Finally, if the jury deemed Armadillo to be a willful infringer and counterfeiter of the Design Marks, based on the limited and skewed evidence presented, how much easier would it be for the jury then to decide that Armadillo probably infringed and counterfeited the word marks at issue in this case, too? The issues in this case are sufficiently intertwined that the decision to grant Armadillo a new trial as to the Design Marks would necessitate the granting of a new trial *in toto*, including as to

Appellee's word mark claims. *See Brooks v. Great Lakes Dredge-Dock Co.*, 754 F.2d 539, 540 (5th Cir. 1985) ("Courts must order a complete retrial of issues 'unless it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice" (*quoting Gasoline Products v. Champlin Refining*, 283 U.A. 494, 500 (1931)).

Since the improper Exclusions unequivocally affected Appellants' substantive rights in this case, and because all of the issues in this case are sufficiently interrelated, Appellants should be granted a new trial as to all issues in the case, except insofar as this Court determines that certain of Appellee's claims are not viable as a matter of law for the reasons argued *infra*.

## II.   Plaintiff Failed to Show Likelihood of Confusion as a Matter of Law.

### a.  Standard of Review.

Following a jury trial, this Court will review legal determinations in connection with a motion for summary judgment if the issue was preserved for appeal in a Rule 50 motion. *See Feld Motor Sports, Inc. v. Traxxas, L.P.*, 861 F.3d 591, 596 (5th Cir. 2017); *see also Dupree v Younger*, 143 S. Ct 1382 (2023) (*finding* that Rule 50 motion not necessary to preserve the right for review). "A Rule 50 motion is reviewed . . . applying the same standard as the district court," and legal questions are "reviewed de novo." *Feld*, 861 F.3d at 597 (internal quotation marks omitted). "[F]actual findings premised upon an erroneous view of controlling legal

principles" are not insulated from review. *Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 196 (1998) ("*Elvis*").

In *Feld*, this Circuit reviewed legal questions presented following issuance of a summary judgment opinion nearly identical to and issued by the same District Court Judge who presided over this case *See e.g. Feld Motor Sports, Inc. v Traxxas, LP*, No. 4:14-CV-543, 2015 WL 4610363, at *1 (ED Tex July 31, 2015). Here, the near total lack of evidence of actual confusion—given the significant amount of time both brands have coexisted in the market—requires a finding, as a matter of law, that the Appellants neither infringed nor counterfeited any of the Design Marks or the HUMMINGBIRD mark.

    b. *No Likelihood of Confusion Where Actual Confusion Does Not Exist, Despite Decades of Coexistence.*

To prevail on a trademark infringement claim, a claimant must show a "likelihood of confusion in the minds of potential consumers as to the source, affiliation, or sponsorship" of Appellants' allegedly infringing products. *See, e.g., Elvis*, 141 F. 3d at 193. This Circuit analyzes whether a likelihood of confusion exist using a nonexhaustive eight-factor "digits of confusion" test: "(1) strength of the mark; (2) mark similarity; (3) product or service similarity; (4) outlet and purchaser identity; (5) advertising media identity; (6) defendant's intent; (7) actual confusion; and (8) care exercised by potential purchasers." *All for Good Gov't v. Coal for Better Gov't*, 901 F.3d 498, 508 (5th Cir. 2018) (citations omitted). "Evidence of actual

confusion is not necessary to a finding of likelihood of confusion, but 'it is nevertheless the best evidence of a likelihood of confusion.'" *Elvis*, 141 F.3d at 203– 204 (quoting *Amstar*, 615 F.2d at 263).

In applying the Digits Factors, the Omnibus Opinion followed a check-the-box approach squarely at odds with the test's intended flexibility. "A finding of a likelihood of confusion need not be supported by a majority of the digits," and "district courts may weigh those digits differently from case to case, depending on the particular facts and circumstances involved." *Future Proof Brands, L.L.C. v. Molson Coors Beverage Co.*, 982 F.3d 280, 289 (2020) (*upholding* determination that plaintiff failed to show a substantial likelihood of confusion despite parties agreeing that three digits favor plaintiff and the District Court finding that a fourth marginally favored plaintiff and a fifth was neutral). By contrast, the Omnibus Opinion incorrectly asserts that Appellants' argument that certain "digits should be given more weight" than others "is contrary to relevant law." (ROA.24706).

The weight that the District Court assigned to the four factors improperly deemed to have been "essentially conceded" by the Appellants—mark similarity, product similarity, sales outlet identity, and advertising media identity—is especially problematic in the trade dress context. As the TTAB stated in its recent *Jasmin Larian* decision, "courts exercise particular caution when extending protection to product designs because such claims present an acute risk of stifling competition."

36

*In Re Larian, LLC*, 2022 WL 374410, at *2 (Trademark Tr. & App. Bd. Jan. 19, 2022). Whereas "most trademarks only create a monopoly in a word, a phrase, or a symbol, granting trade dress protection to an ordinary product design would *create a monopoly in the goods themselves*." *Id.* (emphasis added).

When a party challenges a competitor's product configuration, it is unexceptional that the products are of the same kind, have similar configurations, and are sold and advertised through the same channels. That is the nature of competition. Thus, in *Sno-Wizard Mfg., Inc. v. Eisemann Products Co.*, where the district court found that "the design and the configuration of the machines were identical except for the identifying language on the door," this Court found that the assessment of likelihood of confusion "focus[es] on whether the defendant is passing off his goods . . . as those of the plaintiff by virtue of the substantial similarity between the two" and that the manufacturers' prominent use of housemarks, the care consumers are likely to exercise in making such an expensive purchase, a reasonable explanation for the similarity of the product designs that negated bad intent, and an absence of evidence of actual confusion supported a determination that there was no "likelihood of confusion." *Sno-Wizard Mfg., Inc. v. Eisemann Products Co.*, 791 F.2d 423, 428-430  (5th Cir. 1986).

Similarly, in the case that is nearly identical to this one, *Gibson Guitar Corp. v. Paul Reed Smith Guitars*, 423 F.3d 539 (6th Cir. 2005) ("*PRS*"), the Sixth Circuit

reversed the district court's grant of summary judgment to plaintiff where the district court found that *all* of the Sixth Circuit's digits of confusion favored plaintiff. In reversing the District Court below, the Sixth Circuit focused solely on whether, under the specific circumstances of the case, the lower court's decision could stand in the absence of point-of-sale confusion. The Sixth Circuit held that Appellants failure to demonstrate point-of-sale confusion was dispositive of its claim and stated that it was "not necessary . . . to discuss the remaining seven [confusion] factors" because there was "no theory of confusion upon which [Appellee] can prevail." *PRS*, 423 F.3d at 549. The same result should follow here.

To find that there is no likelihood of confusion as a matter of law, this Court need not go as far as the *PRS* Court in deciding that the absence of confusion evidence outweighs all of the other Digits Factors. Regarding the strength of the Design Marks, except for the ES, the Omnibus Opinion found that the "evidence does not point in one direction" (ROA.24708)—despite the extraordinarily prejudicial impact of the Exclusions. As argued in the Omnibus Motion (ROA.24274), Appellee's survey only demonstrated that the Appellee brand name was famous (ROA.7223:21–25, 7230:10–7231:08, 7233:15–18); Appellants' expert presented evidence that the Body Shapes were not affiliated with any particular company (ROA.8784:08–8787:25); and none of Appellee's witnesses testified that consumers associated the Body Shapes in isolation with Appellee as source.

In examining intent, the relevant inquiry is whether a defendant intended "to confuse, mislead, or deceive the public," which "normally involves . . . efforts by a party to 'pass off' its product as that of another." *Amstar*, 615 F.2d at 263 (citations omitted). This factor should be settled by the jury's finding that the Armadillo Appellants did not have unclean hands (ROA.5924–5925, 5930–5931) because the Appellants did not "knowingly intend[] to use [Appellee] trademarks for the purpose of deriving benefit from [Appellee's] goodwill," nor did they "'subjectively and knowingly' intend[] to cause mistake or to confuse or deceive buyers" (ROA.5908–5909). (*See also* ROA.24277–24278, collecting record evidence that (i) Zelinsky wanted to outcompete Appellee and other manufacturers when designing the Dean V and Z (ROA.7512:22–7513:05, 7513:22–25, 7545:02–24); (ii) Armadillo continued to make Dean V and Z guitars after receiving an objection letter in 2017 to preserve Dean's 40-year legacy of making those guitars with those shapes (ROA.7740:25–7741:09, 7741:15–7742:05); and (iii) testimony of an executive working for Appellee that he did not believe that Armadillo had any "ill-intent" in selling Dean Vs and Zs (ROA.8647:12–8649:25)). Finally, as the Omnibus Opinion acknowledges, "both sides agree[d]" that the factor regarding the care exercised by consumers "favored [Appellants]." (ROA.24714, *see also* ROA.24279) Finally, neither Appellants nor Appellee sold the Design Marks (i.e., guitar bodies or headstock) in isolation in the marketplace; rather, Appellants and Appellee sold

guitars displaying their respective housemarks with other differentiating product configurations. (ROA.7842.21–7243:23).

Had the District Court permitted the Exclusions, all three of these factors would clearly have favored Appellants decisively. But even if the District Court's determinations as to the strength factor were accepted without regard to the Exclusions, the intent and consumer care factors, together with the absence of any point-of-sale confusion evidence as to any of the Design Marks or the HUMMINGBIRD mark, compel the finding that there is no likelihood of confusion here, as in *PRS*. *See PRS*, 423 F.3d at 553 (where "point-of-sale confusion does not occur between these high-priced guitars, . . . there is simply no basis on which [Appellee] can show confusion that would demonstrate trademark infringement in violation of the Lanham Act" (citing *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 117 (2004) (trademark infringement "requires a showing that the defendant's actual practice is likely to produce confusion in the minds of consumers about the origin of the goods")).

As in *PRS*, the record is devoid of any meaningful confusion evidence. Indeed, as Appellants pointed out (ROA.16359), Appellee's opposition "fail[ed] to address that it ha[d] not offered *any* evidence of confusion related to the Dean Gran Sport (7 years of coexistence [with the SG]), the Dean Headstock (20 years of coexistence [with the Dove Wing Headstock]), Luna Athena 501 (9 years of coexistence [with

the ES]), and Luna Fauna Hummingbird (9 years of coexistence [with the HUMMINGBIRD word mark]).” *See Elvis Presley*, 141 F.3d at 204 (“[A]bsence of, or minimal, actual confusion . . . over an extended period of time of concurrent sales weighs against likelihood of confusion”); *Petro Stopping Centers, L.P. v James Riv. Petroleum, Inc.*, 130 F3d 88, 95, (4th Cir 1997) (holding that the failure to uncover more than a few meager instances of purported confusion creates a “presumption against likelihood of confusion in the future” (*citing Amstar Corp.*, 615 F.2d at 263)); *Oreck Corp. v. U.S. Floor Systems, Inc.*, 803 F.2d 166, 173 (5th Cir. 1986) (concurrent use for 17 months with no actual confusion was “highly significant” and weighed against a likelihood of confusion); *Amstar,* 615 F.2d at 263 (only three instances of actual confusion after nearly fifteen years of coexistence raised a presumption against likelihood of confusion); *CareFirst of Maryland, Inc. v First Care, P.C.*, 434 F3d 263, 269 (4th Cir 2006) (“Although proof of actual confusion is not necessary to show a likelihood of confusion, the absence of any evidence of actual confusion over a substantial period of time—here, approximately nine years—creates a strong inference that there is no likelihood of confusion.”). As for the ES, the SG, the Dove Wing Headstock, and HUMMINGBIRD, Appellee’s opposition to Appellants’ summary judgment motion cited no examples of actual confusion; no evidence of actual confusion was introduced at trial; and the Omnibus

Opinion did not cite any specific evidence of actual confusion. (*See* ROA.24485-24486)

Concerning the Flying V and Explorer, Appellee also could not present any actual confusion evidence from that forty-plus-year coexistence period with was the Dean V and Z.  This significance of this fact is bolstered by the fact that Appellee was aware of Dean since the 1970's, yet took no action on this knowledge (*see* ROA.6991:8–24)).  Moreover, the at best *de minimis* confusion evidence that was presented does not deserve any weight: (i) testimony of *momentary* confusion by two employees of Appellee (ROA.6882:18–24, 6933:02–6943:24, 6872:02–6875:10, 6924:08–6927:01, 8638:01–8641:01); (ii) hearsay testimony regarding vague recollections concerning  a handful of unidentified customers, sales clerks, and friends who *may* have experienced confusion (*see id.,* ROA.7249:15–7259:11), and (iii) hearsay testimony concerning social media posts that an employee of Appellee accidentally "liked" (ROA.6871:11-6875:10, *but see* 6919:02-6927:01, acknowledging that he took no further action, other than "unliking" the post, after mistakenly "liking" the Dean guitar).  None of this evidence demonstrates point-of-sale confusion, and Appellee's reliance on this smattering of momentary mix-ups and vague, hearsay recollection (*see* ROA.24485) demonstrates precisely how *unlikely* consumers are to experience confusion.

Finally, whereas Appellants introduced into evidence a nationwide consumer survey showing a net confusion of 0% between the Appellee Flying V and Dean V; 1.3% between the Appellee Explorer and Dean Z; 2.4% between the Appellee SG and Dean Gran Sport; 0% between the Appellee Dove Wing Headstock and the Dean Headstock; and 4.5% between the Appellee ES and Luna Athena 501 (*see* ROA.11427-11429, 8770:21–8790:16, 8784:08–8787:25, ROA.9551 (DTX-1442), ROA.9552 (DTX-1461 and  DTX-1466), ROA.12078, p. 74, 90–99); Appellee presented no survey evidence whatsoever on confusion*,* and Appellee's expert testified that he was not even asked to pose questions about actual confusion in the consumer survey he conducted for this case (ROA.8836:05–11, 2336:04–2373:06) ("Those are the surveys they asked me to take. I assume they had good reasons for asking me to take those two surveys, and that's what I did."); *See also George & Co. v. Imagination Ent. Ltd.,* No. 1:07-cv-0498, 2008 WL 2883771, at *3 (E.D. Va. July 25, 2008), *aff'd*, 575 F.3d 383 (4th Cir. 2009) ("Given that [plaintiff] bears the ultimate burden of proving a likelihood of confusion by a preponderance of the evidence, that lack of survey evidence, while not fatal, severely hampers [plaintiff's] ability to meet that burden.").  Where Appellee went to the trouble to conduct a survey, but failed to address confusion in the survey, it should be presumed that Appellee knew the results would demonstrate that there was no actual or likelihood of confusion.  *See Cairns v Franklin Mint Co.*, 24 F Supp 2d 1013, 1041, (CD Cal

1998) (*collecting cases*); *see also Braun Inc. v Dynamics Corp. of Am.*, 975 F2d 815, 828 (Fed Cir 1992) (*collecting cases*); *Essence Communications, Inc. v Singh Indus., Inc.*, 703 F Supp 261, 269, (SDNY 1988) (*finding* that the failure to offer a survey showing the existence of confusion is evidence that the likelihood of confusion cannot be shown); *Planet Hollywood, Inc. v. Hollywood Casino Corp.*, 80 F. Supp. 2d 815, 884 (N.D. Ill. 1999), clarified, 1999 WL 1186802 (N.D. Ill. 1999) ("[T]he Court finds that Planet Hollywood's failure to offer evidence of actual confusion— either directly or through a survey—demonstrates a failure of proof by Planet Hollywood on the important element of actual confusion.").

For the foregoing reasons, this Court should determine that the District Court erred in failing to grant the Appellants' summary judgment motion and Omnibus Motion on likelihood of confusion as to all of the Design Marks and the HUMMINGBIRD mark.

## III.   Appellants Did Not Counterfeit as a Matter of Law.

### a.  Standard of Review

For the reasons set forth in Arg. Section II.a *infra*, this Court reviews the District Court's determinations *de novo. See Feld*, 861 F.3d at 596.

### b.  Use of Prominent Housemarks and Other Differentiating Features Preclude a Finding of Counterfeiting.

Here, Appellee did not raise a single fact issue in opposition to Armadillo's summary judgment (ROA.15312–15318) and the Omnibus Opinion confirmed that

the counterfeiting issue was a legal determination as to what constitutes a counterfeit

(ROA.24716). Appellants argued, at both the summary judgment and Omnibus

Motion stages, that the various product and design features (excluding body shape)

of the guitars and the prominent use of Dean and Luna housemarks both preclude

confusion *and* demonstrate the absence of any intent by Appellants to deceive, and

that these undisputed facts preclude a finding of counterfeiting, as a matter of law.

(ROA.11430–11434, ROA.24284–24285).

The Omnibus Opinion's reliance on an overly narrow construction of

"counterfeit" (*see* 15 U.S.C. § 1127 (*defining* "counterfeit" as a "spurious mark

which is identical with, or substantially indistinguishable from, a registered mark"))

as a basis for presumably failing to grant summary judgment and upholding the jury

verdict is misplaced. The Court's interpretation of "counterfeit" as precluding

contextual analysis is not only contrary to the guidance that the Fifth Circuit has

given on infringement and counterfeiting determinations for decades, it has

produced the following truly absurd result: although Dean V and Z shaped guitars

have been sold open and notoriously alongside Appellee in the same retail outlets

and to the same customers for more that forty years (to take but those two examples);

despite that Appellee could not adduce at trial even one substantiated instance of

point-of-sale confusion as to either of those shapes; and although the jury determined

that Appellants did not have unclean hands; yet Defendant has now been found to

have *counterfeited* Appellee's generic marks. The nonsensical nature of this outcome is self-evident.

The District Court construed the question of whether a counterfeiting determination should be made with regard to market context as a matter of first impression for the Fifth Circuit, ignoring the *considerable* guidance on this question from the Fifth Circuit, which  consistently indicates that context has a direct bearing on infringement and counterfeiting (which is infringement plus) analysis.  In *Sun-Fun Products, Inc. v. Suntan Research & Dev. Inc.*, 656 F.2d 186, (5th Cir. 1981), this Court noted that "it is difficult to assess degree of similarity in a vacuum":

> In assessing the likelihood of deception occasioned by the use of the trademark in question, all the surrounding circumstances should be scrupulously explored. The fact that the litigating trademarks appear side by side in the judicial solemnity of the courtroom is by itself enough of a falsification of actual market conditions to defy realistic appraisal. Judges, therefore, must attempt to pierce this patently unreal situation and refer to the operative facts behind the scene. Equally as significant as the general appearance of the trademarks is their use in the public market, their effect upon dealers, purchasers and other competitors, the relationship of the trademark's owners, e. g., whether they meet with competing articles in competing markets, how they develop their business, and whether they are acting bona or mala fide.

*Id.* at 189 (*quoting* 3 R. Callman, The Law of Unfair Competition Trademarks and Monopolies s 82.2 (3d ed. 1969). The *Sun-Fun Products* Court clearly demonstrates a recognition that infringement analysis, much less analysis of a trade dress counterfeiting claim, requires a more fulsome evaluation than is possible if the thirteen-word definition of "counterfeit" cited by the District Court.

46

In *Elvis*, this Court took considerable pains to insist upon the importance of market context in evaluating the use of a mark: "Courts consider marks *in the context that a customer perceives them in the marketplace*." *Elvis*, 141 F.3d at 198 (*citing Oreck*, 803 F.2d at 171 (*considering* the presentation of the marks in advertising in determining the similarity of the marks and the defendant's intent); *Sun Banks of Fla., Inc. v. Sun Fed. Sav. & Loan Ass'n*, 651 F.2d 311, 318 (5th Cir. 1981) (*considering* the presentation of the marks in advertising in determining the similarity of the marks); *Nat'l Ass'n of Blue Shield Plans v. United Bankers Life Ins. Co.*, 362 F.2d 374, 378 (5th Cir. 1966) (*comparing* marks as used in advertising in newspapers and on television where the black and white format did not allow for color distinctions); *Sun-Maid Raising Growers v. Sunaid Food Prods., Inc.*, 356 F.2d 467, 469 (5th Cir. 1966) ("[I]t is the labels that the prospective purchaser sees. The trademarks cannot be isolated from the labels on which they appear.") (additional citations omitted)); *see also Future Proof Brands, L.L.C. v Molson Coors Beverage Co.*, 982 F3d 280, 295 (5th Cir 2020) ("[I]t is well established that [c]ourts consider marks in the context that a customer perceives them in the marketplace, which can include labels, packages, or . . . advertising material directed to the goods (internal quotation marks omitted)).

Therefore, market context is not only relevant to assessing similarity but—critically in the counterfeiting context—also *intent*. Indeed, the *Elvis* court found

that "how the Defendants configured the mark" was "highly probative of the impression they intended to convey." *Elvis*, 141 F.3d at 198 (*faulting* the district court for having "failed to consider" this context). Appellee witnesses and representatives testified that a counterfeit Appellee guitar would undeniably bear the GIBSON housemark. (ROA.7046:09–24 ("So you envision counterfeit to also say the word 'Gibson' on the guitar?" "Yeah."), 7403:25–7405:07, 7460:11–7461:07). Here, there is no record evidence that Appellants manufactured or sold a guitar that said "Gibson" on it, tried to pass off their products as Appellee's. To the contrary, the record shows that Appellee and Appellants were intense competitors and that Appellants took enormous pride in the Dean and Luna brand guitars. (ROA.7323:08–14, 7741:02–7742:05, 7842.21–7843:23).

In addition to overlooking Fifth Circuit law directing courts to consider marks in context, the Court below also ignored that Appellee's own representatives' and experts' testimony that—as they have testified in other cases—they themselves must look at the headstock, the name on the headstock, and features such as serial numbers to identify a guitar's source, not the shape![10] (See ROA.7168:05–17) The hallmark of counterfeiting law is to protect both mark-holders and consumers from deceitful

---

[10] Once again, this testimony demonstrates the extraordinary prejudice caused by the Exclusions—how can a guitar body shape *not* be generic, or at least quite weak commercially, if Appellee's own employees cannot tell that a guitar is manufactured by Appellee without looking at the housemark, serial number, or other indicia of manufacture?

efforts to trade on another goodwill, but the notion of deceit here is nonsensical (which is then strongly probative of intent) when, like novice purchasers, Appellee's own executives and experts must rely on a guitar's housemark to identify source. *See id*; *see also Gibson Brands, Inc. v. John Hornby Skewes & Co.,* No. CV 14-00609, 2016 WL 7479317, at *6, 7 (C.D. Cal. Dec. 29, 2016) (based on testimony by Appellee's then expert that it was "common sense" that, "[i]f you want to know who made a guitar, you should look at the name . . . on the guitar," finding that "no rational jury could find that a particular body shape or headstock stamped with a different guitar brand is a counterfeit of a Gibson trademark"); *see also PRS*, 423 F.3d at 549 n.13 (*quoting* Appellee as having argued that when one buys either a PRS or Appellee guitar, "you'd have to be an idiot not to know which guitar you're buying. There's labels on it, hang tags, you pay $ 3000, we understand that"). While Appellee openly and notoriously made these same types of admissions here, it attempts to "changed its tune" and distance itself from telling current and prior admissions, as it finally found a Court to countenance what other courts, including a Circuit court, would not.

Finally, reviewing an allegation of counterfeiting in commercial context is particularly important where trade dress is at issue, since courts must be vigilant not to award monopolies. Indeed, this Court's holding that there was no likelihood of confusion in *Sno-Wizard Mfg., Inc.*, where the district court found that "the design

and the configuration of the machines were identical except for the identifying language on the door" is instructive here. *Sno-Wizard Mfg., Inc* 791 F.2d at 428–30. Rather than mechanically examining and tabulating the Digits, the *Sno-Wizard* Court focused the marketplace specific inquiry of "whether the defendant is passing off his goods . . . as those of the plaintiff." *Id.* This should be determinative here.

Notably, the District Court did not cite a single Fifth Circuit case (or a case from any other Circuit) standing for the proposition that exclusion of market context is justified by the plain language of 15 U.S.C. § 1127 or otherwise. Nor did it cite any Fifth Circuit case that rejected any of the precedents from this Circuit or the district courts in the Second, Fourth, and Ninth Circuits that Appellants provided as support on in their summary judgment (ROA.11430-11434) or the Omnibus Motion (ROA.24282-24285), including those involving Appellee. Accordingly, because the context clearly establishes that Appellant did not counterfeit the Body Shapes or the HUMMINGBIRD word mark, this Court should find for Appellants on Appellees counterfeiting claims as a matter of law.

**IV.    Enjoining Appellants from Manufacturing, Advertising, or Selling the Dean V and Dean Z Was an Abuse of Discretion.**

*a.  Standard of Review*

The grant of a permanent injunction is reviewed for abuse of discretion, factual findings are reviewed for clear error, and conclusions of law are reviewed *de*

*novo. See Peaches Entm't Corp. v. Entm't Repertoire Assocs., Inc.*, 62 F.3d 690, 693
(5th Cir. 1995)

> **b.  *Where Jury Found Laches and Substantial Prejudice, The Permanent***
> ***Injunction Was an Abuse of Discretion.***

The District Court's opinion in support of the Final Judgment's permanent
injunction (ROA.5976–5998) (which also bars Armadillo from selling, and
Concordia from aiding in selling, the Gran Sport, the Luna 501, and guitars utilizing
the word "Hummingbird") is the culmination of the through-the-looking-glass
reality created by the Exclusions and the District's Court's inappropriate
interpretations the applicable law. Here, the District Court found irreparable harm
based on the jury's finding of likelihood of confusion (ROA.5980–5981)—while
acknowledging evidence of actual confusion was at best, scant (ROA.24714)—and
Appellee's unsupported assertion that it had "suffered irreparable harm through the
loss of control of its reputation as embodied in the infringing marks" (ROA.5981)
(emphasis added))—even though the Exclusions would have established that, as far
as the Body Shapes were concerned, Appellee had ceded "control of its reputation"
to scores of guitar manufacturers for nearly half a century. In finding that Appellee
had no adequate remedy at law, the District Court again accepted Appellee's
conclusory assertion of reputational harm and loss of goodwill and quality control.
(ROA.5982). In balancing the equities, the District Court correctly found that
Appellants would suffer "loss of sales on the Dean V and Z guitars [and] loss of

51

goodwill or harm to reputation that has been built over decades," but concluded that "merely require[ing] [Appellants] to comply with federal law" (*id.*) was more important—notwithstanding that federal law does not protect marks that are generic or so commercially weak that likelihood of confusion does not exist (*see Gibson Brands, Inc. v. John Hornby Skewes & Co.,* No. CV 14-00609, 2016 WL 7479317, at *6, 7 (C.D. Cal. Dec. 29, 2016)

Notwithstanding the overwhelming concerns about the use of trade dress protection to confer monopolies, the District Court found that issuance of "a permanent injunction would support the goals of trademark laws" by "protecting the public from confusion or deception" (ROA.5982)—neither of which has been shown by Appellee. The District Court's abuse of discretion in granting Exclusions, its erroneous weighing of the Digits Factors, and misinterpretation of counterfeiting stacked the deck against Appellants in a way decisive, devastating, and allowed the District Court to continue its abuse of discretion towards Appellants here.

While the District Court recognized that Appellee delayed *forty years* "in asserting its rights" as to the Dean V and Z (and 20 years as to the Dean Evo Headstock) (ROA.5984), the Court asserted that the "mere delay" of forty years does not bar injunctive relief and that "courts have granted injunctions even after delays of over twenty years." (ROA.5985). In support of that proposition, the Court cited four cases with delays of twenty years or "approximately" twenty years—two United

States Supreme Court cases from 1888 and 1900, one District of New Jersey case from 1955, and one District of Delaware case from 1959. (ROA.5985, *compare with* ROA.23367–23373, Appellants summarizing and collecting cases from this Circuit barring injunctions where laches was found for periods of five years, nine years, twelve years, and twenty years), *see also* ROA.24298–24300) The District Court then concluded, yet again, that the "goal of preventing consumer confusion," which was demonstrated not to exist here, required a greater showing to avoid an injunction's issuance. (ROA.5985)

Here, the District Court's issuance of the injunction overlooked the legal maxim that injunctive relief should be no broader than necessary to prevent deception (*Diageo N. Am., Inc. v Mexcor, Inc.*, 661 Fed Appx 806, 813-14 (5th Cir 2016),[11] which was not present here. It also nullified the jury's undue prejudice and laches finding, claiming that such finding did not amount to a finding of "substantial prejudice" that was not put to the jury, which the District Court asserted was required to prevent the issuance of a permanent injunction. (ROA.5986, *quoting Conan Props. v. Conans Pizza, Inc.*, 752 F.2d 145, 153 (5th Cir. 1985). Notably, the District Court did not define the difference between undue and substantial prejudice—which

---

[11] It is also submitted that the exact conduct proscribed by the injunctive relief is unclear and therefore void, as an ordinary person cannot determine the exactly what conduct is prohibited. (*See e.g.* ROA.24501-24508; *discussing* Appellee's attempt to wipe out the historical legacy of Dean); *Diageo N. Am., Inc. v Mexcor, Inc.*, 661 Fed Appx 806, 814, (5th Cir 2016).

the *Conan* Court suggested was similar to substantial reliance (*see Conan*, 752 F.2d at 153 ("Whether phrased as 'reliance' or 'prejudice', the effect is the same—the defendant has done something it otherwise would not have done absent the plaintiff's conduct."). Instead, the District Court's analysis as to the Dean V and Z was cursory, merely noting that, over an eight-year period, Dean Vs and Zs account for "only 5.5% of Armadillo's total production and drawing the conclusion that they "account for only a small percentage of Armadillos total production and sales." (ROA.5988) The Court added that "the evidence does not establish[] whether [Appellants] would have undertaken the investments in development and goodwill had they known [Appellee] would later sue for infringement." (ROA.5988).   The production percentage alone does not tell much of a story, thereby making it easy to dispatch.

Here, the record is flush with evidence contradicting this statement.  More importantly, it defies common sense to openly and notoriously build a brand for forty years that can be dismantled by Appellee at any time. Appellants briefing concerning the injunction gave an extensive explanation of Appellants substantial reliance, and the District Court chose to look ignore it:

> [O]ver the course of Gibson's delay, Armadillo (and its predecessors) have made significant investments and developed extensive goodwill in the Dean V [and Dean Z] through extensive and continuous use in the United States, millions spent on advertising these products over four decades, and countless famous artists playing guitars with these shapes on stages, promotions, and videos all over the world. Armadillo and the Dean brand have played a central role in making these shapes famous, and consumers and artists alike have come to expect these shapes to be offered under the DEAN brand, particularly

the DEAN V and DEAN Z offered for over 40 years. [ROA.7741:15–7742:05, 7843:10–13, ROA.8391:16–20). Requiring Armadillo to deviate from its rich history and the DNA of a brand that it developed over multiple decades would cripple Armadillo's roster of artists, result in the loss of customers and millions in revenue, and would be "extremely detrimental" and "devastating" to the DEAN brand as a whole. [ROA.7741:15–7742:05, ROA.7843:10–13, 8233:11–8234:01, ROA.8391:16–25] This is precisely the type of substantial prejudice that consistently precludes the issuance of an injunction under the well-established Fifth Circuit precedent discussed above.

(ROA.23372)

When considered in the context of the case and the marketplace, the District Court's over-simplified analysis ignored the extensive record of over forty years of coexistence in the marketplace without any actual customer confusion, as well as the substantial prejudice of the Appellants.  Accordingly, the Court abused its discretion in issuing an injunction barring the Appellants from manufacturing, advertising, and selling the Dean V and Z.

Finally, the Omnibus Motion requested modification of the Final Judgment to clarify that the injunction only applied territorially within the United States. (ROA.24325). Appellee failed to oppose  and District Court overlooked this request for relief. This relief is further bolstered by (i) the ruling today in *Abitron Austria GmbH v Hetronic Intl., Inc.*, 21-1043, 600 U.S. _____, 2023 WL 4239255, at *2 (US June 29, 2023), which held that the provisions of the Lanham Act prohibiting trademark infringement are not extraterritorial and only extend only to domestic

claims and (ii) the European Union (ROA.741-750) and other territories have deemed certain Body Shapes to be generic.

## CONCLUSION

For the foregoing reasons, the Court should determine that no likelihood of confusion between Appellants' marks and Appellee's marks exists as a matter of law. It should also find that Appellants cannot have counterfeited any of Appellees' marks as a matter of law. If less than all of Appellees' claims are not disposed of by this Court's ruling, the Court should remand this case to the District Court for a new trial but direct that where the jury in the preceding trial found laches, that finding should stand. Finally, should the Court decline to take any of these actions, it should direct the District Court to vacate the portion of the Final Judgment enjoining the sales of the Dean V and Z and/or modify the territoriality of the injunction.

Dated: 29 June 2023

Respectfully submitted,

**SCARINCI HOLLENBECK LLC**

*/s/ Ronald S. Bienstock*
Ronald S. Bienstock
rbienstock@sh-law.com
150 Clove Road | 9th Floor
Little Falls, New Jersey 07424
Telephone:   (201) 896-7169
Facsimile:    (201) 896-7170

— and —

**HENRY ODDO AUSTIN & FLETCHER,**
**A PROFESSIONAL CORPORATION**

*/s/ Emileigh S. Hubbard*
Vic Houston Henry
TBA No. 09484250
vhhenry@hoaf.com
Emileigh Stewart Hubbard
TBA No. 24076717
ehubbard@hoaf.com
1717 Main Street, Suite 4600
Dallas, Texas 75201
Telephone:   (214) 658-1900
Facsimile:    (214) 658-1919

*Attorneys for Appellants Armadillo*
*Distribution Enterprises, Inc. and*
*Concordia Investment Partners, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on June 29, 2023, I caused the foregoing to be electronically filed with the Clerk of the Court for the U.S. Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. All counsel of record are registered CM/ECF users, and will be served by the appellate CM/ECF system.

SCARINCI HOLLENBECK LLC

*/s/ Ronald S. Bienstock*
Ronald S. Bienstock
rbienstock@sh-law.com
150 Clove Road | 9th Floor
Little Falls, New Jersey 07424
Telephone:   (201) 896-7169
Facsimile:    (201) 896-7170

## CERTIFICATE OF COMPLIANCE

1.  This document complies with the type-volume limit of FED. R. APP. P. 32(a)(7)(B) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f) and 5th CIR. R. 32.1:  this document contains 12,994 words.

2.  This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5), and 5th CIR. R. 32.1 and the type-style requirements of FED. R. APP. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word  in 14-Point Times New Roman typeface.

SCARINCI HOLLENBECK LLC

*/s/ Ronald S. Bienstock*
Ronald S. Bienstock
rbienstock@sh-law.com
150 Clove Road | 9th Floor
Little Falls, New Jersey 07424
Telephone:   (201) 896-7169
Facsimile:   (201) 896-7170
