**22-40587**

IN THE

# United States Court of Appeals

## FOR THE FIFTH CIRCUIT

◆◆

GIBSON BRANDS, INCORPORATED, A DELAWARE CORPORATION,

*Plaintiff-Appellee/Cross-Appellant,*

—v.—

ARMADILLO DISTRIBUTION ENTERPRISES, INCORPORATED, A FLORIDA
CORPORATION; CONCORDIA INVESTMENT PARTNERS, LLC,

*Defendants-Appellants/Cross-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS

## REPLY BRIEF FOR DEFENDANTS-APPELLANTS/CROSS-APPELLEES

RONALD BIENSTOCK
SCARINCI HOLLENBECK, LLC
150 Clove Road
Little Falls, New Jersey 07424
(201) 896-4100

VIC HENRY
EMILEIGH S. HUBBARD
HENRY, ODDO, AUSTIN
  & FLETCHER, P.C.
1717 Main Street, Suite 4600
Dallas, Texas 75201
(214) 658-1900

*Attorneys for Defendants-Appellants/
  Cross-Appellees*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................ i

SUMMARY OF THE ARGUMENT .....................................................1

ARGUMENT ...................................................................................2

   I.  The MIL6 Ruling and the Exclusions Were an Abuse of Discretion that Fatally Prejudiced Appellants' Genericness Counterclaims and Its Defenses....................2

     a.  The District Court's Reliance on *Converse* Was Improper. .........................4

     b.  Appellee's Additional Arguments in Defense of the MIL6 Ruling Fail. .....8

   II.  Appellee Failed to Establish Likelihood of Confusion as a Matter of Law. ..12

   III.  Appellants Did Not Counterfeit. ...................................................17

   IV.  The Permanent Injunction Issued in This Case Should Be Lifted.................20

CONCLUSION ...............................................................................23

CERTIFICATE OF SERVICE .........................................................25

CERTIFICATE OF COMPLIANCE....................................................26

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Abitron Austria GmbH v. Hetronic Int'l, Inc.*,
　　No. 21-1043, 2023 WL 4239255 (U.S. June 29, 2023) ...................................23

*Abraham v. Alpha Chi Omega*,
　　708 F.3d 614 (5th Cir. 2013) ..................................................................20

*Amazing Spaces, Inc. v. Metro Mini Storage*,
　　608 F.3d 225 (5th Cir. 1980) ..............................................................6, 16

*Armco, Inc. v. Armco Burglar Alarm Co., Inc.*,
　　693 F.2d 1155 (5th Cir. 1982) ...............................................................20

*Conan Properties, Inc. v. Conans Pizza, Inc.*,
　　752 F.2d 145 (5th Cir. 1985) .................................................................20

*Converse, Inc. v. Int'l Trade Comm'n*,
　　909 F.3d 1110 (Fed. Cir. 2010) ....................................................4, 6, 7, 8

*Ducks Unlimited, Inc. v Boondux, LLC*,
　　214-CV-02885, 2017 WL 3579215 (W.D. Tenn. Aug. 18, 2017) ....................15

*Dupree v. Younger*,
　　598 U.S. ---, 143 S. Ct. 1382 (2023) .......................................................13

*Gibson Guitar Corp. v. Paul Reed Smith Guitars*,
　　423 F.3d 539 (6th Cir. 2005) .....................................................13, 14, 16

*Hartsell v Dr. Pepper Bottling Co. of Texas*,
　　207 F3d 269 (5th Cir 2000) ....................................................................4

*Herrington v. Hiller*,
　　883 F.2d 411 (5th Cir. 1989) ...................................................................9

*Indus. Development Bd. of Town of Section, Ala. v. Fuqua Indus., Inc.*,
　　523 F.2d 1226 (5th Cir. 1975) .................................................................4

*Malaco Leaf, AB v. Promotion in Motion, Inc.*,
　　287 F. Supp. 2d 355 (S.D.N.Y. 2003) .......................................................7

i

*Moore v. Gibbs Const.*,
  No. 95-60096, 1996 WL 101378 (5th Cir. 1996) ................................................. 9

*Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*,
  783 F.3d 527 (5th Cir. 2015) ................................................................... 12

*Pennzoil-Quaker State Co. v Miller Oil and Gas Operations*,
  779 F3d 290 (5th Cir 2015) ....................................................................... 22

*Perry v. H.J. Heinz Co. Brands, L.L.C.*,
  994 F.3d 466 (5th Cir. 2021) ................................................................... 12

*Progressive Distribution Servs., Inc. v. United Parcel Serv.*,
  856 F.3d 416 (6th Cir. 2017) ................................................................... 15

*Russell v. Plano Bank & Trust*,
  130 F.3d 715 (5th Cir. 1997) ..................................................................... 4

*Sno-Wizard Mfg., Inc. v. Eisemann Products Co.*,
  791 F.2d 423 (5th Cir.) ....................................................................... 18, 19

*Stratton v. Jackson State Univ.*,
  3:20-CV-00202, 2021 WL 6804250 (N.D. Miss. May 17, 2021) ..................... 11

*United States v. Page*,
  661 F.2d 1080 (5th Cir. 1981) (*quotation marks omitted*) ................................ 10

*Yee v. City of Escondido, Cal.*,
  503 U.S. 519 (1992) ............................................................................... 13

*Yurman Design, Inc. v. PAJ*,
  262 F.3d 101 (2d Cir. 2001) ..................................................................... 7

**Federal Statutes**

15 U.S.C. 1065(4) ..................................................................................... 5

**Rules**

Federal Rule of Evidence 403 ...................................................................... 9

Federal Rule of Appellate Procedure 10(e)…..………………………………..10

# SUMMARY OF THE ARGUMENT

Appellee[1] argues that: (i) Appellants[2] purportedly received a fair trial on their genericness counterclaims and their defenses, even though Appellants were improperly barred from presenting evidence that the Body Shapes' use by dozens of guitar manufacturers for decades rendered those shapes generic before, at the time of, and after their registrations (*see* Brief at 31-34); (ii) likelihood of confusion was established, even though Appellee instructed its survey expert not to ask about confusion, Appellants' survey established there was no confusion, and Appellee's only purported evidence of "actual" confusion consisted of two deponents' largely inadmissible deposition testimony vaguely recalling five alleged instances of purported momentary confusion that pertained to only two of the five Design Marks (*see* AO at 44 (conceding that this evidence was the only confusion evidence presented); *see also* Argument Section II infra (describing the testimony)); (iii) Appellants were fairly adjudged as counterfeiters, even though Appellants never sought to pass off their guitars as affiliated with Appellee, aggressively branded their guitars and the accessories sold with them, such as cases for example, with

---

[1]   Appellee only filed a reply/opposition to Appellants' Brief and did not file a principal brief for the cross-appeal.

[2]   All capitalized terms have the same meaning as in Appellants' Brief for Defendants-Appellants/Cross-Appellees ("Appellants' Brief" or "Brief") unless otherwise defined. The brief for Plaintiff-Appellee/Cross-Appellant is referred to as "Appellee's Opposition" or "AO."

distinctive housemarks and packaging, and incorporated other differentiating product design and performance features into their instruments (*e.g,* distinctive headstocks and other similar features) (*see* Brief at 44-50); and (iv) the District Court's was justified in issuing its anti-competitive injunction preventing Appellants' manufacture and sale of signature products synonymous with the Dean brand since its inception in 1977, even though the jury found that Appellants' conduct caused Appellee to suffer *zero dollars* in actual damages during the extensive period of their coexistence (*see* ROA.5922-5933). As demonstrated in the Brief and herein, the disconnect between Appellee's positions and any reasonable view of this case are both glaring and contrary to law.

## **ARGUMENT**

### I.   **The MIL6 Ruling and the Exclusions Were an Abuse of Discretion that Fatally Prejudiced Appellants' Genericness Counterclaims and Its Defenses.**

Appellee opens its Brief with a deeply flawed narrative of the Gibson company's history (*see* AO 3-8) that underscores the critical importance of the Exclusions to every aspect of this case. Appellants could not cogently challenge Appellee's narrative at trial and cannot do so in this reply because the evidence necessary to do so was encapsulated in the Exclusions. The triumphalist narrative that Appellee was free to tell at trial without countervailing evidence cemented Appellee's one-sided and misleading version of events in the jurors' minds. This

allowed Appellee to create a tale of purported market dominance concerning Appellee's design innovations that went virtually unchallenged in the marketplace until an upstart "Chicago teenager" with "average capability and imagination" as a guitar-maker (AO at 10) came along with his Dean V and Dean Z.[3]

In the context of this case, that narrative is a bait-and-switch. Appellee foregrounds the name recognition of its brand to augment the impression that its Design Marks in fact function as source indicators. The key issues in this case, however, do not turn on who originally designed the Design Marks but on the history of those marks' use in commerce — by Appellee, by Appellants, and *by dozens of other guitar manufacturers over a period of decades*. This core issue never reached the jury because, in the counterfactual world created at trial, Zelensky purportedly

---

[3]    Appellee's fixation on presenting its market activity as *sui generis*, regardless of inconvenient facts, extended to its USPTO applications for the Body Shapes. Appellee's applications claimed that no other person or entity had the right to use Appellee's marks in commerce. *See* ROA.9619, Exhibit DTX-3889 at 4-5 (Flying V Body Shape); ROA.9619, Exhibit DTX-3891 at 6-7 (Explorer Body Shape); Exhibit DTX-3888 at 6-7 (ES Body Shape); Exhibit DTX-3892 at 5-6 (SG Body Shape).

Further, in response to subsequent office actions, Appellee stated in each case that "[t]he uniqueness of Applicant's present configuration is so distinct from anything else in the market that it would be immediately recognized as a trademark and should be registered on the Principal Register without further proof." *See* ROA.9619, Exhibit DTX-3889 at 24 (Flying V); Exhibit DTX-3891 at 15 (Explorer); Exhibit DTX-3888 at 21 (ES); Exhibit DTX-3892 at 64 (SG). Even the limited record that Appellants were able to present at trial demonstrates these representations to be false.

emerged into a marketplace almost exclusively occupied by Appellee. Appellants' ability to demonstrate the evolution of that marketplace over decades was hamstrung on the eve of trial by a ruling without any clear basis. Accordingly, Appellants never had a fair opportunity to present their counterclaims that the Body Shapes are all generic or their affirmative defenses to Appellee's infringement and counterfeiting claims.

### a. The District Court's Reliance on *Converse* Was Improper.

As a threshold matter, Appellee suggests that Appellants failed to object to the District Court's jury instructions. Even if that were true, which it is not,[4] it is

---

[4]    Appellee's claim is inaccurate. The parties engaged in an extensive back-and-forth proposing and objecting to jury instructions and briefing their positions (for Appellants' submissions and objections, *see* ROA.3996-4081, 4118-4249, 4468-4577, 4818-4827, 5020-5031), but the District Court promulgated its own instructions, not filed via ECF, at an informal charge conference in chambers. These instructions varied considerably from either party's proposals. While the parties had opportunity to place objections on the record the following morning (*see* ROA.5848, 5868, 5884-5918, 8261:12-8262:20, 8580:12-25, 8742:19-8745:03, 8746:25-8752:17, 8904:21-8906:25, 8951-8953, 23878-23883), what transpired at the conference left no doubt that extensive objections based on the earlier briefing would be futile. The Fifth Circuit recognizes that, in this context, a party need not repeat positions that have already been clearly rejected in order to preserve them. *See Hartsell v Dr. Pepper Bottling Co. of Texas*, 207 F3d 269, 273 (5th Cir 2000) (failure to object to a jury instruction "may be excused when a party's position equating to an objection has previously been made clear to the trial judge") (*citing Russell v. Plano Bank & Trust*, 130 F.3d 715, 720 (5th Cir. 1997)); *Indus. Development Bd. of Town of Section, Ala. v. Fuqua Indus., Inc.*, 523 F.2d 1226, 1237 (5th Cir. 1975) ("[F]ailure to object to jury instructions may be disregarded if the party's position has previously been clearly made to the court and it is plain that a further objection would be unavailing.") (quotation marks and parentheses omitted)).

irrelevant. Appellee seems to argue that the District Court's instruction that an incontestable trademark "may become generic over time" *implicitly* instructed the jury that it should only consider genericness evidence postdating the Body Shapes' registrations, which occurred between 1996 and 1999, and that Appellants' supposed nonobjection amounted to consent to this implied instruction. (AO at 24-25.)  This convoluted and meritless argument expressly contradicts Appellee's representation to the District Court during discussion of the jury instructions that Appellee "contend[ed] that the marks are incontestable except for genericness." (ROA.8743:1-23). Appellee's interpretation is also entirely unsupported in the instructions themselves, and it is simply not credible that the District Court intended to rely on twelve jurors drawing the same obscure inference in order to understand how to evaluate a central issue in the case.

More significantly, the interpretation that Appellee advances is fatally flawed because, consistent with Appellee's assertion at trial that "marks are incontestable except for genericness," as genericness is not a quality that comes and goes, and a jury may well determine that a mark should not have been registered in the first place. *See* 15 U.S.C. 1065(4) ("§ 1065(4)") (providing an owner's right in a registered mark used continuously for five consecutive years after registration "shall be incontestable" *provided that* "no incontestable right shall be acquired in a mark which is the generic name for goods or services or a portion thereof, for which it is

registered"). The plain language of the statute—which presumes a registered mark that has been in commercial use for five continuous years after registration—states that "incontestable" status simply does not vest in a mark that is generic.

The fact that genericness is not a transient quality bears directly on Appellee's convoluted efforts to salvage the District Court's misplaced reliance on *Converse, Inc. v. Int'l Trade Comm'n*, 909 F.3d 1110 (Fed. Cir. 2010). (ROA.5806-5809)  The District Court misconstrued *Converse*, which considered only whether a party's use of trade dress had acquired secondary meaning prior to registration, as justifying the wholesale exclusion of decades of third-party use evidence. (*See* Brief at 22-24.) But genericness simply was not at issue in *Converse*. Rather than concede that the District Court erred, Appellee attempts to reframe the question of genericness as "whether the alleged prior uses of Gibson's guitar shapes by third parties would impact the public's perception 'as of the relevant date,'" which Appellee deems to be the registration date. (AO at 28.) This framing has no grounding in relevant law and Appellee provides no support for it other than its own obscure interpretation of the jury instructions.

This Court held in *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225 (5th Cir. 1980), that "generic marks may never acquire secondary meaning and are

categorically excluded from protection."[5] Simply put, when something is dead, it stays dead. Terms like "escalator" and "cellophane" cannot again become protectible, and this conclusion carries even more force in the trade dress context — once a product shape is generic in the marketplace, an improper or erroneous registration of that shape as a mark cannot make it protectible even after five or more years of continuous commercial use by the registrant. Appellee's contrary position would perversely incentivize registrants who succeed in placing a generic mark on the principal register to delay instituting enforcement proceedings and sit on their rights for at least five years, until the mark became purportedly "incontestable," as Appellee did here. That outcome makes no sense, and Appellee's attempted defense of the District Court's application of *Converse* accordingly fails.

Finally, even if Appellee's interpretation of *Converse* and its application in this case were defensible, Appellee's argument would still fall short. The District Court's exclusion of third-party use evidence from 1997 to 2014 would still, and in fact did, preclude Appellants from presenting to the jury precisely what Appellee

---

[5]   Courts in other circuits have taken a slightly different tack, finding that a showing of secondary meaning may be made for a generic mark, but without rendering it protectable. *See, e.g.*, *Malaco Leaf, AB v. Promotion in Motion, Inc.*, 287 F. Supp. 2d 355, 364 (S.D.N.Y. 2003) ("showing of secondary meaning is insufficient to protect product designs that are . . . generic") (*quoting Yurman Design, Inc. v. PAJ*, 262 F.3d 101, 115 (2d Cir. 2001)). But the upshot is the same:  genericness is a fixed, not a transient quality.

claims Appellants were entitled to show, that the Body Shapes became generic after registration.[6]

### b. Appellee's Additional Arguments in Defense of the MIL6 Ruling Fail.

Adding insult to injury, Appellee also defends the MIL6 ruling and the Exclusions by speculating that certain documents are so old, Appellee might not be able to adequately contextualize them had they been admitted because, for example, companies have gone out of business. (AO at 38-39)   Appellee thus seeks to weaponize its own unreasonable delay in registering the Body Shape marks and bringing its claims against Appellants. However, none of Appellee's speculative concerns are relevant since the District Court did not make a single factual finding concerning any single piece of evidence in disallowing the Exclusions. Over three decades' worth of evidence was rejected by the District Court sight unseen, first in reliance on *Converse* (*see* Brief at 14-15) and then with the unsupported and unelaborated statement that "concerns regarding judicial efficiency and *possible* confusion with the jury compel[led]" adherence "to a cut-off date" (Brief at 15-16 (quoting ROA.5816) (emphasis added)). Vague and unspecified references to

---

[6]   In arguing the MIL6 rulings and the Exclusions were somehow not prejudicial even if they were an abuse of discretion, Appellee erroneously states that Appellants were able to present evidence of "competing third-party uses from 1992 until the trial, encompassing 30 years." (AO at 39.) As the MIL6 ruling makes perfectly clear, third-party evidence from 1997 to 2014 was also excluded, erasing another 17 years of evidence from the jury's view.

"*possible* confusion" and "judicial efficiency" simply cannot justify obliterating the foundation of Appellants' genericness counterclaims and its affirmative defenses — especially where the District Court had previously acknowledged that such third-party evidence was "at the core of Armadillo's argument that [Appellee's] marks are generic" and "necessary to Armadillo's defense." (Brief at 13 (quoting ROA.2852; 2905-2906)).

As this Court has repeatedly recognized, the exclusion of probative evidence pursuant to FRE 403 "is an extraordinary remedy that must be used sparingly" (Brief at 26 (*quoting Herrington v. Hiller*, 883 F.2d 411, 414 (5th Cir. 1989)), especially where a wholesale exclusion of evidence risks creating, as occurred in this case, artificial and unreasonable results (Brief at 21 (*citing Moore v. Gibbs Const.*, No. 95-60096, 1996 WL 101378, at *5 (5th Cir. 1996)). Nothing in the District Court's MIL6 orders or Appellee's Opposition justifies the use of so extraordinary a remedy on the eve of trial here.

Appellee's array of additional arguments in defense of the MIL6 ruling all fail for the same reason its FRE 403 argument fails. Appellee purports to fault Appellant for not demonstrating that the Exclusions were "'substantially similar' or 'substantially identical' to the trademark" (AO at 31), conveniently ignoring that Appellants had no opportunity to do so because the District Court made its MIL6 without reviewing any evidence and then directed the form of Appellants' offer of

proof. (ROA.5854–58; 8260:24–25)  Appellee then faults Appellants for not moving to enlarge the record on appeal to include the proffered exhibits that Appellee concedes "were never admitted" (AO at 31), even though "Rule 10(e) exists to allow the district court to conform the record to what happened, not to what did not." *United States v. Page*, 661 F.2d 1080, 1082 (5th Cir. 1981) (*quotation marks omitted*). Further, Appellee's numerous concerns with how the evidence might have been evaluated or potential issues with individual documents' provenance or admissibility (*see generally* AO at 33-36) are simply beside the point because these issues were never reached.  Nor could Appellee's speculative concerns possibly justify the reflexive exclusion of all Exclusions, much less without any substantive review.[7]

Finally, Appellee asserts a cursory, and frankly absurd, argument that the MIL6 ruling did not cause Appellants substantial prejudice, claiming that (i)

---

[7]    Appellee also falsely assert that Appellant did not plead the importance of pre-registration uses to its genericism claim. *See* AO at 28-29; *but compare* ROA.1922-1927 (alleging in Appellants' First Counterclaim for cancellation of Appellee's Registration No. 2051790 that "[f]or decades, from the 1960s onwards, numerous third-party companies and guitar builders have been and/or are using and offering for sale electric guitars in the United States incorporating a guitar body identical or nearly identical to the '790 V Body Shape without authorization from Gibson. As a result, the public does not perceive the '790 V Body [S]hape as a source identifier and thus the '790 V Body Shape is incapable of functioning as a mark.")  Appellants made substantially similar allegations in their Second Counterclaim (the Z-shaped mark),  Third Counterclaim (the ES-shaped mark), and Fifth Counterclaim (the SG-shaped mark).

Appellant was permitted to present nearly thirty years' worth of third-party use evidence (*but see* n.3 *supra* (explaining that the Exclusions barred Appellants from presenting evidence or even arguments about seventeen (17) of those years)) and (ii) testimony from Appellants' expert witness cured any prejudice (*see* AO at 39-40 (asserting this without support or elaboration)).  Neither of these arguments are remotely defensible.  In fact, the briefest consideration of Appellee's narrative of Gibson's history in its Opposition herein suffices to debunk Appellee's self-serving claims. In fact, Appellee's Opposition argues that "[a]fter the Ibanez lawsuit" filed in 1977, "[o]ver the next few decades, the Gibson shapes acquired distinctiveness in the marketplace." (AO at 9.)  But absent all of the Exclusions to contextualize the history of the overall marketplace, how could a juror possibly evaluate the truth or falsity of that claim?[8]

The Exclusions allowed Appellee the unfettered ability to present its counterfactual reality and amounted to a summary judgment on Appellants' genericness claims and their affirmative defenses (excepting laches).  *See, e.g.*, *Stratton v. Jackson State Univ.*, 3:20-CV-00202, 2021 WL 6804250, at *1 (N.D.

---

[8]  Appellee's strategy to focus attention on its brand's name recognition and corporate history rather than the strength of the Design Marks as source indicators truly came into its own in a trial where Appellants not only were deprived of the evidence required to establish genericness but also to tell their own very different narrative of the guitar marketplace's history in the 1960's, 1970's, 1980's, the early and late 1990s, 2000's, 2010's, and the early 2020's.

Miss. May 17, 2021) (*finding* that Plaintiff's motion *in limine* request to "argu[e] or present[] evidence in support of its affirmative defense" amounted to a claim that Plaintiff was "entitled to summary judgment," which "is not a proper use of a motion *in limine*"); *see also* Brief at 25 n.8 (citing cases for the proposition that the grant of a motion *in limine* that is tantamount to a grant of summary judgment is an abuse of discretion). It was an abuse of discretion so prejudicial to Appellants' case that it can only be cured by a new trial.

## II. Appellee Failed to Establish Likelihood of Confusion as a Matter of Law.

Appellants agree with Appellee that analyzing likelihood of confusion using the Digits Factors is often a task for the factfinder (*see* AO at 41),[9] but Appellants maintain that here, where there were no disputed material facts as to the Digits Factors, where the marks at issue were product configuration marks, and where the products utilizing those marks coexisted in the marketplace for between seven and *more than 40 years*, the District Court should have found both on summary judgment and in its Omnibus Opinion that the record's total absence of direct consumer evidence of confusion (including Appellee's survey that purposely excluded

---

[9]   *But see, e.g.*, *Perry v. H.J. Heinz Co. Brands, L.L.C.*, 994 F.3d 466, 473 (5th Cir. 2021) (affirming summary judgment decision finding no likelihood of confusion); *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 544 (5th Cir. 2015) (affirming summary judgment determination that trademark holder's mark had not acquired secondary meaning, notwithstanding that the "determination of secondary meaning is primarily an empirical inquiry" informed by seven factors (cleaned up)).

examination of confusion and Appellants survey that demonstrated no confusion) compelled the conclusion that likelihood of confusion did not exist as a matter of law.[10] Because this is a purely legal question, review by this Court is proper. *See Dupree v. Younger*, 598 U.S. ---, 143 S. Ct. 1382, 1389 (2023).

As Appellee grudgingly acknowledges, the Sixth Circuit case *Gibson Guitar Corp. v. Paul Reed Smith Guitars*, 423 F.3d 539 (6th Cir. 2005) ("*PRS*") is squarely on point. *PRS* focused on Appellee's "solid-body single-cutaway" Les Paul electric guitars (the "LP Guitar"), which Appellee began selling as early as 1952. *Id.* at 543. Registration for the LP Guitar's body shape product configuration issued in July 1993, it became "incontestable" in September 1999, and defendant in *PRS* did not begin selling guitars with a substantially similar body shape until January or

---

[10] Appellee's claim (*see* AO at 21) that this argument is waived is meritless. Appellants moved for summary judgment on the grounds that Appellee failed to show likelihood of confusion as to any of the Design Marks as a matter of law (*see, e.g.*, ROA.11422-11430), including, *inter alia*, because (i) Appellee "failed to offer *any* evidence of any purported actual confusion between the Dean Gran Sport and the Gibson SG (despite seven years['] coexistence . . . ), the Dean Headstock and the Gibson Dove Wing Headstock (despite over 20 years['] coexistence), [and] the Luna Athena 501 and the Gibson ES-335 (despite nine years['] coexistence)" and (ii) "Gibson fail[ed] to offer any evidence of a single concrete consume or retailer who was confused" as between the Dean V and Dean Z shapes on the one hand and the Gibson Flying V and Explorer shapes on the other (despite 43 years' coexistence) (ROA.11428). As the U.S. Supreme Court held in *Yee v. City of Escondido, Cal.*, 503 U.S. 519, 535 (1992), a "litigant seeking review . . . of a claim properly raised in the lower courts . . . generally possesses the ability to frame the question to be decided in any way he chooses, without being limited to the manner in which the question was framed below."

February 2000. *Id.* at 544. Despite the district court in *PRS* having found that all of the other digits of confusion favored Appellee, the Sixth Circuit reversed, concluding that it need not consider those factors because Appellee had conceded "that no purchaser would be confused at the point of sale." *Id.* at 549. As a result, there was "no theory of confusion upon which Gibson can prevail." *Id.* Appellee's attempt to distinguish *PRS* on the grounds that "initial interest confusion and post-sale confusion are now widely accepted Lanham Act liability theories" (AO at 43) is baseless. The *PRS* court discussed those theories at length, acknowledged their viability in certain contexts, and found they had no application in *PRS*. *See PRS* at 550-52. Moreover, Appellants' claim here goes beyond what the *PRS* Court found, namely, that *there is also no competent evidence of actual confusion at all* in the record. After as many as 40-plus years of coexistence in the marketplace, this total absence of evidence has at least as much force as the concession by Appellee that the Sixth Circuit relied on in finding that likelihood of confusion could not be established as a matter of law.

At the summary judgment stage, Appellee relied *exclusively* on the deposition testimony of Aljon Go, an Appellee employee of nearly twenty years, and Joseph Lefebvre, who had worked at a Sam Ash music store, to attempt to establish that *some* evidence of actual confusion existed. (AO at 44.) Go testified regarding an

Instagram post that momentarily confused him (ROA.15416, Ex. I at pgs. 116-117)[11] and about a conversation between a salesperson and a customer about who manufactured a Dean guitar that Go allegedly overheard. (ROA.15416, Ex. I at pg. 148.) As for Lefebvre, in response to a request to tell "everything" he knew "about information related to confusion with Dean guitars," he testified that "[t]here were three instances where . . . I had customers that confused a Dean V and a Dean Z with being affiliated with Gibson guitars due to their body shapes." He elaborated, regarding a customer who picked up and tested out a Dean V, that the customer "asked if it was a Gibson in any way, like an Epiphone or anything like that. And that was the extent of pretty much all three" instances of customer "confusion." (ROA.15416, Ex. L at pg. 30) That is the sum and substance of Appellee's confusion evidence drawn from 40-plus years of marketplace co-existence.

The weakness of this testimony is apparent. Go did not identify either a particular Design Mark at issue or the substance of what the customer supposedly said, which would be hearsay. Lefebvre's testimony is also hearsay and, in any case, the snippet of conversation he purportedly recalled does not demonstrate confusion

---

[11] Mr. Go's testimony regarding his seconds-long confusion over an Instagram post should be discounted entirely as "legally irrelevant," because employees "do not qualify as consumers." *Ducks Unlimited, Inc. v Boondux, LLC*, 214-CV-02885, 2017 WL 3579215, at *29 (W.D. Tenn. Aug. 18, 2017) (*citing Progressive Distribution Servs., Inc. v. United Parcel Serv.*, 856 F.3d 416, 434 (6th Cir. 2017) ("[I]n a trademark infringement action, the focus rests upon the likelihood of a consumer being confused by the two marks and not an employee.").

and cannot be established on this record as anything more than speculative curiosity. Even if all their testimony is credited, it does not approach a showing of actual confusion.

Considering this record, it is little wonder that Appellee's expert testified he was not asked by Appellee to question respondents about actual confusion in the consumer survey that Appellee commissioned for this case.[12] (ROA.8836:05-11; 2336:04-2373:06.) Indeed, Appellee was apparently not even able to locate one confused consumer to be deposed or take the stand at trial.

In *PRS*, Appellee filed its lawsuit in November 2000 (*PRS* at 544), after defendant's allegedly infringing product had coexisted with Appellee's LP Guitar for *less than a year*. Here, there is no competent evidence of actual confusion for any of the Design Marks (or the Hummingbird Word Mark), despite the products bearing those marks having coexisted in the marketplace for between approximately 7 and 42 years. The absence of such evidence is more powerful still given that, as

---

[12]   In the secondary meaning context, the Fifth Circuit has "consistently expressed a preference for an objective survey of the public's perception of the mark at issue." *Amazing Spaces*, 608 F.3d at 248. That preference should be equally strong here, where products bearing Appellee's Design Marks have competed with Appellants' products bearing similar marks for years or even decades, and the availability of such evidence is beyond dispute.

Appellants also note that the diminished impact at trial of the absence of actual confusion evidence was aided and abetted by Appellee's persistent focus on the triumphs of its corporate history and familiarity of its brand name — none of which would have been possible without the improper MIL6 ruling and the Exclusions.

Appellees have conceded, the parties' guitars with substantially similar Body Shapes have been advertised in the same media outlets and sold through the same retail channels throughout their marketplace coexistence. In other words, guitar customers — whom the record uniformly characterizes as highly sophisticated (*see, e.g.*, AO at 3 ("The guitar public recognizes differences in shapes not readily apparent to the casual observer.")) — have had every opportunity to experience confusion, *but they have not, do not, and will not*.[13]

The District Court should have granted summary judgment to Appellants on Appellee's counterfeiting and infringement claims (as to the Design Marks and the Hummingbird Word Mark) and should also have granted Appellants' renewed motion for a judgment as a matter of law after trial. Failure to do so was reversable error, and this Court should reverse and dismiss Appellee's counterfeiting and infringement claims with prejudice.

## III.    Appellants Did Not Counterfeit.

This Court routinely examines market context to understand whether an allegedly counterfeit product is likely to be perceived as counterfeit by a consumer and whether the manufacturer of the product intended for it to deceive. (*See* Brief at 46-47 (collecting cases)). Even on the artificially limited record created by the

---

[13]   Appellant *did* conduct a nationwide consumer survey establishing that there was not confusion as to any of the Design Marks. *See* Brief at 43.

Exclusions and the MIL6 ruling, the Body Shapes are clearly so ubiquitous that, as Appellee conceded in two other cases, its own experts and consumers alike must look to the housemark on the headstock or other source indicia to identify the manufacturer. (Brief at 48-49.)   Additionally, as in *Sno-Wizard Mfg., Inc. v. Eisemann Products Co.*, 791 F.2d 423 (5th Cir.), market context is particularly important where product configuration is at issue, because an unwarranted counterfeiting finding will inevitably have a chilling effect across the marketplace and may establish a *de facto* monopoly in commonly used product designs. (Brief at 49-50.)  Appellee's Opposition presents nothing to the contrary.[14]

---

[14]  Once again, however, Appellee deploys a host of demonstrably false claims that distract from the important questions. Appellee asserts that Appellants did not argue on summary judgment that "the use of house marks in a product [allegedly] containing a [purportedly] counterfeit mark" precludes a finding of counterfeiting. AO at 21. In point of fact, Appellants expressly argued that the "futility of Gibson's counterfeiting argument is . . . apparent" because "Armadillo prominently uses its distinct and well-known DEAN and LUNA names and logos on the front of the headstock for all of its accused products." (ROA.11432-33.) Next, Appellee claims that Appellants' counterfeiting arguments raise a fact question, not a legal one (AO at 19) while ignoring, as Appellants pointed out in their Brief, that Appellee raised no issues of material fact in opposition to Appellants' motion for summary judgment on counterfeiting (ROA.15312-15318) and also that the District Court's Omnibus Opinion confirmed that the issue raised posed a purely legal question as to what constitutes a counterfeit (Brief at 44-45 (*citing* ROA.24716)). Appellee claims that "Appellants do not argue . . . that the jury was incorrect in finding that Appellants employed counterfeit marks," but Appellants plainly argued at length that the Omnibus Opinion erred in denying Appellants judgment as a matter of law on Appellee's counterfeiting claims. AO at 44-45. Bizarrely, Appellee devotes considerable attention to whether, at trial, "the jury had only a side-by-side comparison of the competing product on which to base their decisions"; but Appellants do not raise this issue anywhere in their Brief. Here as throughout

Appellee hangs their hat on the notion that a plaintiff alleging counterfeiting is able to establish liability against an "infringer for causing confusion" and that the purpose of a counterfeiting finding is to "allow[] for *enhanced* recovery." (AO at 46 (emphasis in original)). If this is the correct measure of Appellee's counterfeiting claims, they should all fail, as the record establishes definitively that there is no actual confusion, and the jury awarded Appellee *zero* dollars in actual damages — a determination that Appellee declined to appeal. Appellee also stresses the Lanham act definition of "counterfeit" as a "spurious mark." By this measure, too, Appellee's claims fail, because the record is definitive that Appellants made every effort to proudly identify the origin of their products and at no point traded on Appellee's good will. Appellants' use of the marks at issue was not forged or deceitful, and therefore does not meet the definition of "spurious."

Finally, the similarity of a product configuration mark is only one of eight criteria in the Digits Factors test for likelihood of confusion, which is one component of establishing infringement. Appellee's theory (*see* AO at 54-55) asserts this lone digit should cement counterfeiting liability. That is not the law. As in the *Sno-Wizard Mfg.* case (*see* Brief at 49-50), where this Court determined that an identically designed but differently branded product did not even warrant a finding of likelihood

Appellee's Opposition, Appellee battles straw man after straw man and simply ignores the force of Appellants' arguments.

of confusion (*see Sno-Wizard Mfg.*, 791 F.2d at 428-30), there should not even be a question of counterfeiting here.

## IV.    The Permanent Injunction Issued in This Case Should Be Lifted

The Final Judgment's permanent injunction was a *coup de grâce* at the end of a trial unfairly stacked against Appellants. As Appellants predicted to the District Court before the injunction issued, the injunction has compelled Appellants "to deviate from [their] rich history and the DNA of a brand that [they] developed over multiple decades." (Brief at 55 (*quoting* ROA.23372)). The effects have been foreseeably damaging to Appellants' artist relationships, their customer base, their media image, and their brand as a whole. (Brief at 55.) Appellants' Brief explained in detail why the District Court's superficial analysis of prejudice, particularly in light of the jury's laches finding, constituted an abuse of discretion that this Court should reverse. (Brief at 51-56.)

Appellee's reliance on *Abraham v. Alpha Chi Omega*, 708 F.3d 614 (5th Cir. 2013) as vindicating the injunction's issuance is misplaced. In the first instance, the *Abraham* Court acknowledged that "[t]here is no doubt that laches may defeat claims for injunctive relief" (*id.* at 626 (*citing Armco, Inc. v. Armco Burglar Alarm Co., Inc.*, 693 F.2d 1155, 1161 n.14 (5th Cir. 1982)) and also discussed at length the circumstances warranting such forbearance in the Fifth Circuit's *Conan Properties, Inc. v. Conans Pizza, Inc.*, 752 F.2d 145, 150 (5th Cir. 1985) case. While the

permanent injunction issued in *Abraham* was upheld by this Court, the lesson of both *Abraham* and *Conan* is that, where a finding of laches obtains, weighing prejudice prior to issuing a permanent injunction must be undertaken with considerable care. That did not happen here.

While Appellee blithely minimizes the prejudice to Appellants, focusing on the potential "devalu[ation]" of "piece[s] of equipment or other capital investment" used to manufacture the Dean V and Z (AO at 57),[15] and suggests that it would be a simple matter for Appellants to re-design these guitar shapes (AO at 58), Appellee's own Brief proves that the damage caused by the injunction is (as was represented to the District Court) far more substantial. Appellee's Opposition extols the singular importance of the guitar body shape in media images and, most importantly, to the customer: "The guitar public recognizes differences in shapes not readily apparent to the casual observer. Whenever a guitar manufacturer changes a shape, the fans react — often negatively. ROA.6687:10-23 Guitarists are 'brand loyal' to body shapes." (AO at 3; *see also* AO at 9 (describing the time, money, and effort of

---

[15] Yet again Appellee misrepresents the facts in advancing this point. Appellee argues that "[a]s most of Armadillo's guitars are made overseas by contracted manufacturing facilities, it would be surprising" if any of Appellants' physical plant were affected by the injunction. AO at 57-58. But Appellee knows perfectly well that Appellants operate a custom guitar shop in Florida that, prior to the injunction, had done a brisk trade in manufacturing and selling their signature high-end Dean V and Z guitar models.

Appellee's investment in promoting particular guitar shapes and the value of their "status as icons")).

Similarly, having moved for contempt sanctions against Appellants just two weeks after the injunction issued on the grounds that Appellants were too slow to scrub their website of images of the enjoined guitars, Appellee's reply brief in connection with that motion targeted Appellants' historical images dating back to the 70's of artist endorsers playing Dean Vs and Zs (*see* ROA.24371-24376), precisely because Appellee understands that guitarists' brand loyalty to guitar body shapes (*see* AO at 3) would disrupt Appellants' extensive relationships with artist endorsers (and therefore their fans as well), who are no longer able to obtain the shapes they desired from Appellants.[16] Appellee's words and actions concede that the financial and other harms that Appellants face are *not* primarily to physical plant but to Appellants long and extraordinary investment in building the identification of its brands with guitars that utilize particular shapes, with the artists who favor those guitars, and the consumers that are fans of the artists. *See Pennzoil-Quaker State Co. v Miller Oil and Gas Operations*, 779 F3d 290, 296-98 (5th Cir 2015) ("[U]ndue prejudice means . . . defendant has taken steps such as making significant investment decisions or building the bulk of its business based on the reasonable assumption

---

[16]  The portion of Appellee's contempt motion dealing with these historical images of artist endorsers playing the Dean V and Z was denied as having been improperly raised on reply. *See* ROA.24648.

that it had permission to use the plaintiff's marks, and that such investment or capital would be lost if the defendant could no longer use the mark"). Appellee thus concedes the significant harm caused by the injunction against making and selling the Dean V and Z and also the significance of the factors that Appellant asked the District Court to weigh before issuing its Final Order, which factors were either improperly evaluated or ignored. Under the circumstances of this case and in light of the jury's finding of laches, the injunction issued in connection with the Final Order was an abuse of discretion.

To the extent that this Court disagrees, and to the extent that the verdict in the District Court is not otherwise reversed, Appellants renew their request for modification of the Final Judgment to clarify that the injunction does not apply to Dean V and Z guitars that are both manufactured *and* sold overseas, which modification would be consistent with Appellee's reading of the U.S. Supreme Court's recent decision in *Abitron Austria GmbH v. Hetronic Int'l, Inc.*, No. 21-1043, 2023 WL 4239255 (U.S. June 29, 2023). (AO at 58-59.)

## **CONCLUSION**

For the reasons set forth above and in Appellants' Brief, Appellants respectfully request that this Court grant the relief described and respectfully requested in the Brief.

Dated: 30 August 2023

Respectfully submitted,

**SCARINCI HOLLENBECK LLC**

*/s/ Ronald S. Bienstock*
Ronald S. Bienstock
rbienstock@sh-law.com
150 Clove Road | 9th Floor
Little Falls, New Jersey 07424
Telephone:   (201) 896-7169
Facsimile:   (201) 896-7170

— and —

**HENRY ODDO AUSTIN & FLETCHER,**
        **A PROFESSIONAL CORPORATION**

*/s/ Emileigh S. Hubbard*
Vic Houston Henry
TBA No. 09484250
vhhenry@hoaf.com
Emileigh Stewart Hubbard
TBA No. 24076717
ehubbard@hoaf.com
1717 Main Street, Suite 4600
Dallas, Texas 75201
Telephone:   (214) 658-1900
Facsimile:   (214) 658-1919

*Attorneys for Appellants Armadillo*
*Distribution Enterprises, Inc. and*
*Concordia Investment Partners, Inc.*

# CERTIFICATE OF SERVICE

I hereby certify that on 30 August 2023 I caused the foregoing to be electronically filed with the Clerk of the Court for the U.S. Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. All counsel of record are registered CM/ECF users, and will be served by the appellate CM/ECF system.

**SCARINCI HOLLENBECK LLC**

*/s/ Ronald S. Bienstock*
Ronald S. Bienstock
rbienstock@sh-law.com
150 Clove Road | 9th Floor
Little Falls, New Jersey 07424
Telephone:   (201) 896-7169
Facsimile:    (201) 896-7170

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of FED. R. APP. P. 32(a)(7)(B) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f) and 5th CIR. R. 32.1: this document contains 6,115 words.

2. This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5), and 5th CIR. R. 32.1 and the type-style requirements of FED. R. APP. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-Point Times New Roman typeface.

SCARINCI HOLLENBECK LLC

*/s/ Ronald S. Bienstock*
Ronald S. Bienstock
rbienstock@sh-law.com
150 Clove Road | 9th Floor
Little Falls, New Jersey 07424
Telephone:   (201) 896-7169
Facsimile:   (201) 896-7170