# United States Court of Appeals

*for the*

# Fifth Circuit

Case No. 22-40587

GIBSON, Incorporated, a Delaware corporation,

*Plaintiff-Appellee/Cross-Appellant,*

v.

ARMADILLO DISTRIBUTION ENTERPRISES, Incorporated, a Florida corporation; CONCORDIA INVESTMENT PARTNERS, L.L.C.,

*Defendants-Appellants/Cross-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS, SHERMAN, IN NO. 4:19-CV-358,
HONORABLE AMOS L. MAZZANT, U.S. DISTRICT JUDGE

## PETITION FOR REHEARING EN BANC

ANDREA BATES
KURT SCHUETTINGER
BATES & BATES
1890 Marietta Boulevard, NW
Atlanta, Georgia 30318
(404) 228-7439

– and –

STEPHEN D. HOWEN, ESQ.
7111 Bosque Boulevard
Waco, Texas 76710
(254) 826-6526

*Attorneys for Plaintiff-Appellee/
Cross-Appellant*

CP COUNSEL PRESS    (800) 4-APPEAL • (331315)

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**Plaintiff/Appellee:**
    Gibson, Inc. (formerly Gibson Brands, Inc. and referred to as "Gibson")

**Counsel for Plaintiff/Appellee:**
    Stephen D. Howen of the Law Offices of Steve Howen of Waco, TX
    Andrea E. Bates of Bates & Bates, LLC of Atlanta, GA
    Kurt Schuettinger of Bates & Bates, LLC of Atlanta, GA

**Armadillo-Appellants:**
    Armadillo Distribution Enterprises, Incorporated
    Concordia Investment Partners, LLC (referred to collectively as "Armadillo")

**Counsel for Armadillo-Appellants:**
    Vic Henry of Henry, Oddo, Austin & Fletcher, P.C. of Dallas, TX
    Emileigh Hubbard of Henry, Oddo, Austin & Fletcher, P.C. of Dallas, TX
    Ronald Bienstock of Scarinci Hollenbeck, LLC of Little Falls, NJ

## STATEMENT REQUIRED BY FED. R. APP. P. 35(B)(1)

This case presents a question of exceptional importance: whether Lanham Act § 1065(4) mandates cancellation of an incontestable trademark for genericness before or at the time of registration as opposed to genericness at the time of the dispute.   The panel held "yes," concluding that genericness for an incontestable mark for the purpose of cancelling a trademark can and should be measured at any point in time in the trademark's history.   *Gibson, Inc. v. Armadillo Distribution Enterprises, Incorporated, et al.*, No. 22-40587, 2024 WL 3325880 (5th Cir. Jul. 8, 2024).   This ruling is counter to the Lanham Act and the Supreme Court and Fifth Circuit precedent. 15 U.S.C. § 1065; *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189 (1985); *Singer Mfg. Co. v. Briley*, 207 F.2d 519 (5th Cir. 1953).

The panel's holding carries enormous consequences for all trademark owners of mature marks as well as courts and juries deciding genericness challenges.  Under *Gibson*, trademark owners will face genericness challenges where the inquiry will be whether the trademark was generic decades ago, rather than evaluating the mark in the *current market*.

While the practical implications of the decision are immense, Gibson's argument is not based on trademark policy.  Congress has already spoken on the issue.  The Lanham Act already expresses the test for a trademark's viability and strength is *always* based on current market perception.  Congress did so by always

using the present tense of auxiliary verbs ("is" and "has become" instead of "was") when describing the requirements for registration and incontestability of marks as well as the factors used to evaluate whether a mark has earned continuing protection. The Lanham Act is consistent in its phrasing, to include the statutory provisions at issue here.

The panel's use of § 1065(4) defies the plain language of the Lanham Act. The panel first errs by exporting a statutory provision demarked for one purpose (a requirement for *obtaining* an incontestability certificate) for use in an action governed by a separate statutory provision (the methods for *canceling* an incontestability certificate). The panel compounds that error by misreading the provision at issue, ignoring the use of present tense that focuses any inquiry on the current market. This combination of errors creates an unnecessary conflict between provisions within the statute. As a result, the decision violates canons of statutory construction.

The failure to properly construe the statute produces a ruling in ***direct conflict with the logic of United States Supreme Court precedent***, specifically: *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189 (1985). *Park 'n' Fly* holds trademark incontestability "quiets title" to a trademark. The panel's decision does the opposite by inviting re-litigation of issues that were resolved decades ago. Just as importantly, *Park 'n' Fly* teaches that § 1064 provides the sole basis for trademark

cancellation actions, a principle the panel violates by using § 1065(4) as the reason a trademark might be canceled based on ancient history.  The decision *also conflicts with Fifth Circuit precedent*.  *Singer Mfg. Co. v. Briley*, 207 F.2d 519 (5th Cir. 1953).  *Singer* found a trademark valid and enforceable even though the mark was admittedly generic in the past.  That result cannot be squared with the panel's primary holding.

Based on the exceptional practical importance, conflict with *Park 'N Fly* and *Singer,* and errors in interpretation of provisions at the heart of the Lanham Act, rehearing *en banc* is warranted.  Fed. R. App. 35(b)(1)(A-B).

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PERSONS ........................................................i

STATEMENT REQUIRED BY FED. R. APP. P. 35(B)(1) ................................... ii

STATEMENT OF THE ISSUE ASSERTED TO MERIT EN BANC
     CONSIDERATION ................................................................................1

STATEMENT OF THE COURSE OF PROCEEDINGS & DISPOSITION
     OF THE CASE .....................................................................................2

STATEMENT OF ANY FACTS NECESSARY TO THE ARGUMENT
     OF THE ISSUES ..................................................................................3

ARGUMENT & AUTHORITIES ........................................................................4

I.     THE HOLDING CONFLICTS WITH SUPREME COURT
     PRECEDENT AND THE RULES OF STATUTORY
     CONSTRUCTION ................................................................................4

     1)     The Value of a Federal Trademark ..................................5

     2)     Placement on the Principal Register ................................5

     3)     Attacking a Registration ..................................................6

     4)     Achieving and Losing Incontestable Status ....................6

     5)     Case Posture.....................................................................7

     6)     The Correct Application of 15 U.S.C. § 1065(4) .............7

     A.     The Holding Undermines the Quiet Title Concept.....................8

     B.     The Canons of Statutory Construction Support
     Gibson's Interpretation .............................................................9

     1)     Plain Language ................................................................9

     2)     Duty to Harmonize .......................................................11

     3)     Legislative Intent ..........................................................14

     4)     Summary .......................................................................16

II.   *Gibson* Conflicts with the Fifth Circuit's Holding in *Singer II* and Leading Trademark Treatises ........................................................16

    A.   *Gibson* Conflicts with the Fifth Circuit's Holding in *Singer II* ...................................................................................16

    B.   Leading Trademark Authorities ...............................................17

CONCLUSION ..................................................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Appliance Liquidation Outlet, LLC v. Axis Suppl Corp.*,
105 F. 4th 362 (5th Cir. 2024) ..............................................................16

*Caminetti v. United States*,
242 U.S. 470, 37 S. Ct. 192, 61 L .Ed. 442 (1917) .............................14

*Carr v. US,*
560 U.S. 438, 130 S. Ct. 2229, 176 L. Ed. 2d 1152 (2010) ..................8

*Duke v. University of Texas at El Paso*,
663 F.2d 522 (5th Cir. 1981) ...............................................................11

*DuPont Cellophane Co. v. Waxed Products Co.*,
85 F.2d 75, 30 U.S.P.Q. 332 (C.C.A. 2d Cir. 1936) ...........................19

*Easom v. US Well Services, Incorporated*,
37 F.4th 238 (5th Cir. 2022)..................................................................9

*Flowers Industries v. Interstate Brands, Corp.*,
5 U.S.P.Q.2d 1580, 1987 WL 123874 (T.T.A.B. 1987) ................. 18-19

*Gibson, Inc. v. Armadillo Distribution Enterprises, Incorporated, et al.*,
No. 22-40587, 2024 WL 3325880 (5th Cir. Jul. 8, 2024)................. 4, 12, 16, 17

*Holloway v. McElroy*,
632 F.2d 605 (5th Cir. 1980), *cert. denied,* 451 U.S. 1028 (1981).....................12

*Matter of Hammers*,
988 F.2d 32, 71 A.F.T.R.2d 93-1703 (5th Cir. 1993) .........................14

*National R.R. Passenger Corp v. National Ass'n of R.R. Passengers*,
414 U.S. 452, 94 S. Ct. 690, 38 L. Ed. 2d 646 (1974) ................... 14-15

*Neuberger v. Commissioner*,
311 U.S. 83, 61 S. Ct. 97, 85 L. Ed. 58 (1940) ...................................15

*Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*,
469 U.S. 189 (1985) ..................................................................... *passim*

*Reagan Nat'l. Advertising of Austin, Inc. v. Cedar Park*,
2021 WL 3484698 (5th Cir. Aug. 6, 2021)..........................................14

*Singer Mfg. Co. v. Briley*,
 207 F.2d 519 (5th Cir. 1953) ........................................................ 16, 17

*Singer Mfg. v. June Mfg. Co.*,
 163 U.S. 169, 16 S. Ct. 1002, 41 L. Ed. 118 (1896) .................................... 16, 17

*Sueros Y Bebidas v. S.A. de D.V. Indus. Enter., LLC*,
 690 F. Supp. 3d 745 (S.D. Tex. 2023) ................................................. 4-5

*Texaco, Inc. v. Duhe*,
 274 F.3d 911 (5th Cir. 2001) ...........................................................10

*Texas Pig Stands, Inc. v. Hard Rock Café Int'l, Inc.*,
 951 F.2d 684 (5th Cir. 1992) ........................................................ 18, 19

*Two Peso, Inc. v. Taco Cabana, Inc.*,
 505 U.S. 763, 112 S. Ct. 2753, 120 L. Ed. 2d 614  (1992) .................................16

*United States v. Stanford*,
 883 F.3d 500 (5th Cir. 2018) .............................................................11

## Statutes & Other Authorities:

15 U.S.C. § 1051 ......................................................................5, 6

15 U.S.C. § 1064 ................................................................... *passim*

15 U.S.C. § 1065 ................................................................... *passim*

15 U.S.C. § 1115 ................................................................ 5, 11, 13

Jerre B. Swann, Genericism Rationalized, 89 TMR 639 (1999) ...........................17

MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 12:47 (5th ed.) ...........18

MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 132.149 (5th ed.) .......13

S. Rep. No. 1333, 79th Cong., 2d Sess. (1946) .......................................15

*V.N. Palladino, Assessing Trademark Significance: Genericness, Secondary
Meaning and Surveys*, 92 Trademark Rptr. 8576 (2002) .........................................17

**STATEMENT OF THE ISSUE ASSERTED TO MERIT EN BANC
CONSIDERATION.**

1.      Whether Lanham Act § 1065(4) allows a challenge to an incontestable

mark based on alleged genericness before registration?

## STATEMENT OF THE COURSE OF PROCEEDINGS & DISPOSITION OF THE CASE.

Gibson brought a trademark infringement action alleging Armadillo's Dean models infringed the Gibson Incontestable Trademarks. Armadillo countersued seeking cancellation of the Gibson Incontestable Trademarks based on genericness. At trial, Armadillo planned to present evidence of unauthorized third-party use from decades before the Gibson Incontestable Trademarks gained incontestable status.

Gibson moved in limine to exclude evidence of advertisements demonstrating third-party use of the shapes before 1992, which was five to seven years before the registration of the Gibson Incontestable Marks and 10-12 years before the marks became incontestable. The district court excluded specific print advertisements prior to 1992. The jury found Gibson's Incontestable Trademarks were not generic. On appeal, Armadillo argued the district court's exclusion of the advertisements was improper. The panel reversed and remanded.

**STATEMENT OF ANY FACTS NECESSARY TO THE ARGUMENT OF THE ISSUES.**

Gibson owns guitar body shape trademarks created in the 1950s and incontestable since the early 2000s: the SG body shape design®, the Flying V body shape design®, and the Explorer body shape design® ("Gibson's Incontestable Trademarks").[1]

---

[1] The fourth mark on which the trial court granted injunctive relief was the ES Body Shape, which does not enjoy incontestable status. The arguments herein apply only to the three incontestable trademarks.

## ARGUMENT & AUTHORITIES.

## I. THE HOLDING CONFLICTS WITH SUPREME COURT PRECEDENT AND THE RULES OF STATUTORY CONSTRUCTION.

The key holding states "**the Lanham Act allows for a petition filed more than five years after registration to cancel a trademark on the theory that the mark was generic *prior* to registration**." *Gibson*, 2024 WL 3325880 at *6 (emphasis added). That holding has the effect of making third-party use well prior to registration relevant. As applied to incontestable marks, the holding conflicts with *Park 'N Fly* that establishes "[t]he incontestability provisions . . . provide a means for the registrant to quiet title in the ownership of his mark." 469 U.S. 189, 199 (1985). There are additional statutory construction issues unmentioned in *Park 'N Fly* that render the panel's application of the Lanham Act even further from what Congress intended.

To be clear, genericness is always a defense to infringement. Gibson's point is the Lanham Act says for an incontestable mark, the test for genericness is whether the mark is ***currently*** generic. Thus, the many cases that say, for instance, "[o]nce a mark becomes incontestable, its federal registration is conclusive evidence of its validity, subject only to the defenses set out in the Lanham Act, including that the mark has been abandoned or that it *is* generic" are consistent with Gibson's position because they measure current market perception. *E.g., Sueros Y Bebidas v. S.A. de*

*D.V. Indus. Enter., LLC,* 690 F.Supp.3d 745, 756 (S.D. Tex. 2023) (emphasis added).

       1) *The Value of a Federal Trademark.*

A trademark gives its owner the right to prevent others from using that trademark. To enforce Lanham Act rights, a trademark must be registered on the United States Patent and Trademark Office's ("USPTO") "Principal Register" or "Supplemental Register." Only trademarks on the Principal Register can later achieve incontestable status. 15 U.S.C. § 1065.

At an infringement trial, the trademark owner must prove its trademark is valid. "Validity" necessarily means the trademark is not generic. The key difference among the different types of trademarks registrations is the evidence needed to prove a mark's validity. For a Supplemental Register mark, the owner enjoys no evidentiary presumption on validity and non-genericness. For a Principal Register mark, the owner starts with a *prima facie* presumption of validity and non-genericness. 15 U.S.C. § 1115(a). An incontestable mark carries conclusive proof of validity and non-genericness. 15 U.S.C. § 1115(b).

       2)   *Placement on the Principal Register.*

The first step is an application for registration. 15 U.S.C. § 1051. The application's supporting information must convince the USPTO the trademark meets the statutory requirements to be a trademark. If so, the USPTO publishes the

application in its Official Gazette.  Publication allows owners of similar marks to oppose by bringing to the USPTO's attention information that would prevent placement on the registers.  15 U.S.C. §§ 1051-54.  If the application is unopposed or the opposition fails, the mark is registered on the Principal Register or the Supplemental Register.   15 U.S.C. §§ 1051-52.

   3) *Attacking a Registration.*

Competitors who enter the marketplace later have options to prove another's mark invalid.  Within five years after the registration, competitors can file a petition with the USPTO or a claim in federal court to cancel the trademark for any reason that would demonstrate the mark issued in error.  15 U.S.C. § 1064(1).  After five years, 15 U.S.C. § 1064(3)-(6) limits the circumstances for a competitor to cancel a mark.  The relevant Lanham Act provision defines the applicable circumstances as "if the registered mark *becomes the generic name* for the goods or services . . . for which it is registered."  15 U.S.C.  § 1064(3) (emphasis added).

   4) *Achieving and Losing Incontestable Status.*

An "incontestable trademark" is conclusive proof of the mark's validity (e.g., non-genericness) *except for* marks that could be canceled under 15 U.S.C. § 1064 (3), (5), or (6) and marks for which the infringer has a prior use argument. 15 U.S.C. §  1065 (introductory paragraph).  The same introduction mandates incontestable status can be awarded only to marks that have been in active

use for five years following placement on the Principal Register. The numbered subsections for the provision install procedures for affidavit proof from the trademark owner attesting the mark has remained in use after placement on the Principal Register and there has been no court proceeding that degraded or could degrade the ownership or validity of the mark. 15 U.S.C. § 1065 (1)-(3).

    5) *Case Posture*.

Absent 15 U.S.C. § 1065 (4), the Lanham Act's provisions for Armadillo's genericness challenge are clear and simple. Gibson's incontestability certificates meant conclusive proof of non-genericness as of 2002. Armadillo's only means of asserting genericness was to cancel the registrations. Lanham Act § 1064 defines cancellation for genericness based on the mark *becoming* generic after registration. The incontestability section incorporates that test by reference. Thus, the question for the jury was whether marks that were non-generic in 2002 "had become" generic? The trial judge's order was consistent with the Lanham Act and the trial court committed no error.

    6) *The Correct Application of 15 U.S.C. § 1065(4).*

The opinion adopts Armadillo's argument that 15 U.S.C. § 1065(4) *by itself* allows a genericness defense untethered to registration or incontestability dates. The remainder of this brief explains the many reasons the panel's adoption of the § 1065(4) argument is not sound statutory construction and contradicts precedent.

To begin with, however, Gibson offers its interpretation of § 1065(4). The section states "no incontestable right **shall be acquired** in a mark which **is the generic** name for the goods or services or a portion thereof, for which **it is registered**." 15 U.S.C. § 1065(4) (emphasis added). First, the tense structure of the section directs an inquiry at the time the incontestability certificate issues because "it is registered" assumes registration is complete; the remainder of § 1065 limits consideration to marks on the Principal Register; and "shall be acquired" refers to the incontestable certificate yet to issue. *See Carr v. US,* 560 U.S. 438, 449, 130 S. Ct. 2229, 2237, 176 L. Ed. 2d 1152 (2010) (using tense structure to find plan meaning of a statute). Thus, 15 U.S.C. § 1065(4) serves only as a directive to the USPTO to *again* measure genericness when it issues an incontestability certificate.

## A.    The Holding Undermines the Quiet Title Concept.

In *Park 'N Fly* the Supreme Court held a petition to cancel an incontestable trademark should not *relitigate whether registration should have been granted to the mark in the first place. See Park N' Fly*, 469 U.S. at 199 ("The incontestability provisions, as the proponents of the Lanham Act emphasized, provide a means for the registrant to quiet title in the ownership of his mark.").[2] The impact of the panel's holding would be the very thing the Supreme Court warned against, a re-

---

[2] A copy of the decision is attached as Exhibit "**A**".

8

determination of the genericness issue settled at registration and confirmed at incontestability. The thrust of the *Park 'N Fly* respondent's argument was the logical equivalent to Armadillo's position: the trademark "should never have been registered in the first place." *Id.* at 198. In rejecting that contention, the Supreme Court looked to the legislative history and plain language of the Lanham Act to confirm that Section 1064 provides the *sole basis* for cancellation of an incontestable mark. *Id.* at 199-203. The panel did not.[3]

**B. The Canons of Statutory Construction Support Gibson's Interpretation.**

The judiciary developed statutory construction principles to interpret the law and divine Congressional intent. The panel's reading of the statutory provision fails to implement those canons.

*1) Plain Language.*

The panel agreed absent 15 U.S.C. § 1065(4) Gibson's interpretation would control. The question is what meaning is to be given to § 1065(4)? The answer is, of course, the meaning plain English gives the provision. *Easom v. US Well Services, Incorporated*, 37 F.4th 238, 242 (5th Cir. 2022). Section 1065(4) states:

---

[3] It is true that unlike descriptiveness § 1065 mentions genericness, but that does not alter the Supreme Court's conclusion it is § 1064 that must be used to cancel a registration. If one uses the part of the statute the Supreme Court says one must use, the test is whether the Gibson Incontestable Trademarks became generic after 2002, not whether they were generic decades earlier.

"no incontestable right **shall be acquired** in a mark which is the generic name for the goods or services or a portion thereof, for which ***it is registered***." The panel saw the provision as not imposing any temporal limitation, presumably based on the idea "shall be acquired" in the abstract could apply to the genericness of the mark at any time. That reading ignores the last phrase of the sentence. Although "it is registered" is not a date certain, it clearly imposes a timeframe. Section 1065 unambiguously sets a particular point in time: after a mark is registered but before an incontestable right has been acquired.

The Lanham Act's authors or any intervening Congress could have written in plain English the meaning the panel and Armadillo ascribe to § 1065(4). The provision would read: "no incontestable right shall be acquired in a mark which is ***or was*** the generic name for the goods or services or a portion thereof ~~for which it is registered~~." (emphasis and strikethrough added for illustration). But using the plain language of words means not adding, subtracting or modifying those words. *Texaco, Inc. v. Duhe,* 274 F.3d 911, 920 (5th Cir. 2001). The first takeaway from analyzing § 1065(4) is the provision only applies to marks that have already been registered. Any other application impermissibly rewrites the statute. As the Gibson Incontestable Marks were registered at the time of the dispute, the statute asks whether the shape "is" the signifier of a class of products, not "was" the signifier of

10

a class of guitars.  The exclusion of old advertisements would have no or minuscule relevance to the question the statute asks.

### 2) Duty to Harmonize.

The second problem with panel's application of § 1065(4) is the panel says that *by itself* the provision calls for either cancelling a mark or stripping the mark of its conclusive evidentiary power.  The analytical problem with that approach is the Lanham Act already has provisions that govern the cancellation of registrations (§ 1064) and when an incontestable mark loses its evidentiary advantage (§ 1115). The Fifth Circuit usually recognizes "the cardinal rule that a statute is to be read as a whole . . . since the meaning of statutory language, plain or not, depends on context."  *United States v. Stanford,* 883 F.3d 500, 511 (5th Cir. 2018) (internal citations omitted).  Furthermore, "[a] statute must be viewed in its entirety, to afford each part an effect harmonious with the whole and consistent with legislative objectives."  *Duke v. University of Texas at El Paso*, 663 F.2d 522, 525 (5th Cir. 1981).  The decision offers no rationale as to why if affords primacy to the section speaking on the application for incontestable rights when the dispute involved either Armadillo's attempt to cancel the registration based on genericness or argument that genericness robbed the incontestability certificates of their conclusive impact.

The decision to ignore the cancellation section (§ 1064) is difficult to explain and impossible to harmonize because the introductory paragraph for § 1065 incorporates § 1064 for determining which instances render an incontestable certificate inappropriate.  15 U.S.C. § 1065 ("Except on a ground for which application to cancel may be filed at any time under paragraphs (3), (5), and (6) of section 1064 of this title, ...").  When a statute incorporates a separate provision from the same statute, the imported provision becomes part of the subject provision.  *Holloway v. McElroy,* 632 F.2d 605, 629 (5th Cir. 1980), *cert. denied,* 451 U.S. 1028 (1981).

The incorporated provision allows cancellation of the mark "[a]t any time if the registered mark *becomes* the generic name for the goods or services[.]" 15 U.S.C. § 1064(3).  Merriam-Webster defines "becomes" as "to come into existence" or "to undergo change or development."[4]  Section 1064 contemplates marks that are already registered and, thus, not generic.  In that context, § 1064's use of "become" makes sense.  A registered mark can only be registered if there was no finding the mark was generic, but should the mark *become* generic, it is subject to cancellation.  Under *Gibson*, the ordinary meaning of "become" is misplaced in § 1064, as a mark cannot "become" something that it already was.

---

[4]*See* Definition of "become", MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/becomes (last visited Jul. 22, 2024).

There is no obvious importation either from or into § 1115 but the provisions are related.  Section 1065 describes how a trademark achieves incontestability and § 1115 relates how incontestability is used in a lawsuit.  Taken at face value, the absence of a genericness exception to the conclusive nature of an incontestable mark would pull genericness off the table as a defense in any lawsuit involving an incontestable mark other than through a § 1064 cancellation counterclaim.  It seems odd genericness would be mentioned in § 1064 but unlike the other defenses listed there, not in § 1115.  The leading secondary source on trademarks, however, suggests the answer to that puzzle. MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 132.149 (5th ed.).

McCarthy notes that because genericness is mentioned in § 1065, the opening sentence of § 1115(b) incorporates the concept through its reference to registrations that have become incontestable.  ("To the extent that the right to use the registered mark has become incontestable under section 1065 of this title, the registration shall be conclusive evidence of the validity of the registered mark and of the registration of the mark [.]")  Under McCarthy's theory, two things are obvious.  First, if § 1065 is imported into § 1115(b), the reference to § 1064 comes with it.  Second, § 1115(b) uses the same "has become" language.

From there, it is easy to read the three related provisions of the Lanham Act consistently. A trademark is on the Principal Registry only because the examiner

held it to be non-generic. The mark matured into incontestability only because no competitor successfully challenged the mark for genericness. Given that history, the question of whether the trademark ever was generic has been settled, **the title has been quieted**. The relevant genericness question for any subsequent lawsuit is what each of the statutes say: has the trademark *become* generic *after incontestability*? The panel's use of the § 1065(4) disconnected from the other provisions of the act throws that equation into disharmony by suggesting the cancellation and evidentiary use fall under a "has become" genericness test while the grant of incontestability is governed by an "if it ever was" genericness test. Faced with harmony or conflict, the court must choose harmony. *Reagan Nat'l. Advertising of Austin, Inc. v. Cedar Park*, 2021 WL 3484698, at *6 (5th Cir. Aug. 6, 2021).

  *3) Legislative Intent.*

  The sole purpose of statutory construction "is to ascertain the intent of the legislative authority." *Matters of Hammers*, 988 F.2d 32, 34, 71 A.F.T.R.2d 93-1703 (5th Cir. 1993) (citing *Caminetti v. United States*, 242 U.S. 470, 37 S. Ct. 192, 61 L .Ed. 442 (1917)). "The most certain expression of legislative intent in nearly every instance is the words of the subject statute." *Id.* "But even the most basic general principles of statutory construction must yield to clear contrary evidence of legislative intent." *National R.R. Passenger Corp v. National Ass'n of R.R.*

*Passengers*, 414 U.S. 452, 458, 94 S. Ct. 690, 38 L.Ed.2d 646 (1974) (citing *Neuberger v. Commissioner*, 311 U.S. 83, 88, 61 S. Ct. 97, 101, 85 L.Ed. 58 (1940)).

A plain reading of the Lanham Act supports the proposition an incontestable trademark can only be challenged as having *become* generic after the point of incontestability.  There is no variance between the plain language and the announced legislative intent for two reasons.  First, *Park 'N Fly* confirms "Congress enacted the Lanham Act to 'secure trade-mark owners in the goodwill which they have built up.'"  469 U.S. at 213 (citing S. Rep. No. 1333, 79th Cong., 2d Sess., 5 (1946)).  Furthermore, "[t]he incontestability provisions, as the proponents of the Lanham Act emphasized, provide a means for the registrant to quiet title in the ownership of his mark."  *Id.* (citations to the legislative record omitted).  *Park N' Fly* reasons obtaining "incontestable status by satisfying the requirements of § 1065 thus encourages producers to cultivate the goodwill associated with a particular mark.  This function of the incontestability provisions would be utterly frustrated if the holder of an incontestable mark could not enjoin infringement by others so long as they established that the mark would not be registrable but for its incontestable status."  *Id.*  Here, like in *Park 'N Fly*, the central purpose of the incontestability statute—that a trademark owner quiets the title of its trademark—is undermined if others can reach back in time to say an incontestable trademark is unenforceable now because it was generic before or at the time of registration.

15

Second, it is the consumer's perception of genericness that matters. A*ppliance Liquidation Outlet, LLC v. Axis Suppl Corp*., 105 F. 4th 362, 376 (5th Cir. 2024) ("The test for genericness focuses on the perception of consumers."). That concept coincides with the other purpose of the Lanham Act which is to protect "protect the ability of consumers to distinguish among competing producers." *Two Peso, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 774, 112 S. Ct. 2753, 2760, 120 L. Ed. 2d 614 (1992) *(quoting Park 'N Fly*, 460 U.S. at 198). The panel's decision imagines we can determine what the public perception was decades ago and gives that perception more import than what today's customers perceive. That result can only be contrary to what Congress intended.

### 4) Summary

Every applicable canon of construction demands the Court apply § 1065(4) so that the test for genericness is based on what has happened to the Gibson Incontestable Marks after they became incontestable, *i.e.* since 2002.

## II. *Gibson* Conflicts with the Fifth Circuit's Holding in *Singer II* and Leading Trademark Treatises.

### A. *Gibson* Conflicts with the Fifth Circuit's Holding in *Singer II*.

The Fifth Circuit in *Singer II* found a once generic mark could become distinctive and protectable. *Singer Mfg. Co. v. Briley*, 207 F.2d 519 (5th Cir. 1953) ("*Singer II*"). The *Singer* story starts in the late 1800s when the Singer Company began manufacturing sewing machines. *Singer Mfg. v. June Mfg. Co.*, 163 U.S. 169,

172-73, 16 S. Ct. 1002, 41 L. Ed. 118 (1896) ("*Singer I*").  The SINGER® trademark was registered in 1885, but because of an influx of competitors using the mark, the Supreme Court found the mark had become generic.  *Singer I*, 163 U.S. at 183.  Fast forward half a century and the SINGER mark was at issue again—this time in the Fifth Circuit.  *Singer Mfg. Co. v. Briley*, 207 F.2d 519 (5th Cir. 1953) ("*Singer II*").  The Fifth Circuit found through constant and exclusive use of the mark, advertising efforts, and third-party media, the SINGER trademark "has come to mean . . . that the mark 'Singer' serves as a guarantee of quality and that future purchasers of products so marked are the products of Singer Manufacturing Company."  *Id.* at 522.  This Court again granted Singer protected status as a trademark.  *Id.*  Thus, *Singer II* stands for the proposition that trademark owner can revive a generic trademark.  *See V.N. Palladino, Assessing Trademark Significance: Genericness, Secondary Meaning and Surveys*, 92 Trademark Rptr 857, 876 (2002) (citing Jerre B. Swann, Genericism Rationalized, 89 TMR 639, 653-54 (1999).).  *Gibson* would overrule *Singer II* without explaining why.

  **B. Leading Trademark Authorities.**

  Leading treatises on trademarks recognize the discrepancy between the plain language and purpose of the Lanham Act and the panel's treatment of the issue at hand.  McCarthy explains courts have historically misapplied the theory of "de facto secondary meaning" in the genericness context, leading courts to mistakenly

conclude that a once-generic mark can never become a valid trademark.  MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 12:47 (5th ed.).  McCarthy notes that some courts have corrected course.

For example, the Fifth Circuit "said that while a prior decision that a term was generic was final and could never be modified by changes in public perception, a decision that a term was descriptive and without secondary meaning was not binding because consumer perception could change."  *See Id.* (citing *Texas Pig Stands, Inc. v. Hard Rock Café Int'l, Inc.*, 951 F.2d 684, 691 (5th Cir. 1992)).  Notably, McCarthy cited the same case the panel did but for the opposite proposition.

McCarthy explains, "[t]rademark rights, unlike other kinds of property claims, do not remain constant over time."  *Id.*  "As the late Judge Rich of the Federal Circuit observed: 'Rights in this field do not stay put.  They are like ocean beaches; they shift around.  Public behavior may affect them.'  The meaning and significance of words can change, sometime quickly [.]"  *Id.* (quoting Rich, "Trademark Problems As I See Them—Judiciary," 52 Trademark Rep. 1183, 1185 (1962)).  McCarthy notes, "the fact that a descriptive designation was once held not to have acquired secondary meaning as a trademark does not mean that it cannot later acquire that significance.  Why should not the same thinking be applied to generic names that might over time become subordinate and minor and replaced in public parlance by trademark significance?"  *Id.* (citing *Flowers Industries v. Interstate Brands, Corp.*,

5 U.S.P.Q.2d 1580, 1987 WL 123874 (T.T.A.B. 1987); *Texas Pig Stands*, 951 F.2d at 691).  McCarthy forewarns, "[i]t is a bold thing for a court to explicitly ignore customer perception."  *Id.* (citing *DuPont Cellophane Co. v. Waxed Products Co.*, 85 F.2d 75, 81, 30 U.S.P.Q. 332 (C.C.A. 2d Cir. 1936)).  Yet that is what the panel decision accomplishes.

## CONCLUSION.

Gibson respectfully requests *en banc* consideration to resolve these conflicts.

/s/ ANDREA BATES
ANDREA BATES
KURT SCHUETTINGER
BATES & BATES
1890 Marietta Boulevard, NW
Atlanta, Georgia 30318
(404) 228-7439

– and –

STEPHEN D. HOWEN, ESQ.
7111 Bosque Boulevard
Waco, Texas 76710
(254) 826-6526

*Attorneys for Plaintiff-Appellee/*
*Cross-Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that on July 25, 2024, a true and correct copy of the foregoing Petition for Rehearing for En Banc was served via electronic filing with the Clerk of Court and all registered ECF users.


Dated: July 25, 2024

/s/ ANDREA BATES
ANDREA BATES
KURT SCHUETTINGER
BATES & BATES
*Attorneys for Plaintiff-Appellee*
1890 Marietta Boulevard, NW
Atlanta, Georgia 30318
(404) 228-7439

## CERTIFICATE OF COMPLIANCE

This brief has been prepared using 14-point, proportionately spaced, serif typeface, in Microsoft Word.  Excluding the parts of the brief exempted by Fed. R. App. P. 32(f), this brief contains 3879 words.

/s/ ANDREA BATES
ANDREA BATES
KURT SCHUETTINGER
BATES & BATES
*Attorneys for Plaintiff-Appellee*
1890 Marietta Boulevard, NW
Atlanta, Georgia 30318
(404) 228-7439

# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

July 8, 2024

Lyle W. Cayce
Clerk

No. 22-40587

Gibson, Incorporated, *a Delaware corporation*,

*Plaintiff—Appellee/Cross-Appellant*,

*versus*

Armadillo Distribution Enterprises, Incorporated, *a Florida corporation*; Concordia Investment Partners, L.L.C.,

*Defendants—Appellants/Cross-Appellees*.

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 4:19-CV-358

Before Stewart, Clement, and Ho, *Circuit Judges*.
Carl E. Stewart, *Circuit Judge*:

Plaintiff Gibson, Inc. brought trademark-infringement and counterfeiting claims against Defendants Armadillo Distribution Enterprises, Inc. and Concordia Investment Partners, LLC. After a ten-day trial, the jury found in favor of Gibson on several counts of infringement and counterfeiting but also found that the doctrine of laches applied to limit Gibson's recovery of damages. In deciding Gibson's omnibus motion in limine, the district court excluded wholesale decades of third-party-use evidence that Armadillo and Concordia submitted in support of their

genericness defense and counterclaim. Armadillo and Concordia appeal that exclusion order. Because we hold that the district court abused its discretion, we REVERSE and REMAND for a new trial.

## I. Factual Background & Procedural History

### A. Factual Background

A standard modern electric guitar consists of three main parts: the body, neck, and headstock. The body is the largest part of the instrument, and strings run upward from the body, over the neck, and tie into rods on the headstock. The body of an electric guitar has electronic "pickups" that capture and transmit soundwaves and control knobs that further modify the instrument's tonal characteristics. Spaced along the neck at set intervals are "frets," which mark the positions for the player to play the appropriate note by varying the length of the string played. At the end of the neck is the headstock, a block containing the rods that stretch the strings to different tension levels. A player adjusts the pegs protruding from the headstock to alter the guitar's tune. This suit arises from a dispute regarding body and headstock shapes as well as the use of word marks on the guitar headstocks.

#### i. A Brief History of Gibson Guitars

Gibson has produced guitars since the 1800s and in the 1940s produced its first electric guitar, which had a solid body and a headstock in the shape of dove wings. Over the latter half of the twentieth century, Gibson became a larger player in the instrument market, with its growth coming after its introduction of the Flying V and Z-shaped Explorer electric guitars in the 1950s.

In that same decade, Gibson ventured into semi-hollow guitar bodies, releasing its ES-335 design. The body of an ES-335 is symmetrical, with wings similar to Mickey Mouse's ears protruding from each side. In 1960, Gibson introduced the Standard Guitar, or "SG." The SG model offered a slimmer body with horns sticking out from the connection of the guitar's neck and

body. The United States Patent and Trademark Office ("USPTO") issued Gibson trademark registrations for the body shapes, dove-wing headstock, and the "Hummingbird" word mark. As Gibson continued producing electric guitars, a new brand of electric guitars emerged: the so-called "Dean Brand Guitar."

### ii. A Brief History of Dean Brand Guitars

Dean Zelinsky founded Dean Guitars, Inc. in 1976, in Evanston, Illinois. The Dean brand released two guitar models in January 1977, the Dean V and Dean Z. Both models grew in popularity during the 1980s, and popular guitarists from rock bands Kansas, Heart, Def Leppard, and ZZ Top, played on Dean model guitars. In 1991, Zelinsky sold his business to Tropical Music Export Enterprises, Inc., which continued to promote and produce electric guitars under the Dean house mark, including body shapes similar to the Dean V and Dean Z until 1995.

Armadillo then purchased the Dean brand and to date has promoted, manufactured, and sold guitars under the same profile and specifications as the original Dean V and Dean Z guitars released in 1977. Shortly after acquiring the rights to produce Dean guitars, Armadillo began selling Dean-branded guitars, including the Dean V and Dean Z models and a winged headstock.

In 2010, Armadillo introduced its Luna Athena acoustic guitar model, a hollow-body style, similar to Gibson's ES-335. The Luna brand strictly produced acoustic guitars. One of Armadillo's guitars in the Luna line was the "Hummingbird" acoustic guitar. In 2013, Armadillo released its "Gran Sport" model guitar, which—similar to Gibson's SG model—sported a body with horns poking up towards the guitar's neck.

### iii. Gibson's and Armadillo's IP Disputes

Reviewing precisely how this lawsuit was initiated requires turning back the clock to the early 2000s. In 2004, Concordia, as a holding company

for Armadillo, filed a trademark application with the USPTO to register a winged-silhouetted headstock design without any brand name on it. Gibson opposed Concordia's application based on a likelihood of confusion with its own dove-wing headstock, and the Trademark Trial and Appeal Board ("TTAB") heard the dispute. Initially, the TTAB declined to issue Concordia a registered trademark due to similarities in the design of "the undulating curved top of its peg head."

In that same year, the parties drafted an agreement allowing Armadillo and Concordia to license the rights to use Gibson's Flying V and Explorer shapes and requiring Armadillo to secure Gibson's approval for any successor shapes derived from the Dean V and Dean Z. The agreement stipulated that Gibson would drop its opposition to Concordia's headstock registration application and that it would receive royalties in return for the sales of Dean-branded guitars utilizing the Flying V and Explorer shapes. However, the parties did not consummate the agreement, and the dispute languished in the TTAB until 2009. During this period, Armadillo retained Zelinsky, Dean Guitars' founder, as a consultant for its own guitars bearing the Dean brand house mark. The TTAB denied Concordia's application on June 10, 2009, and held that the Dean headstock was likely to cause confusion with Gibson's dove-wing headstock.

In 2015, a Gibson executive received reports from the company's primary trademark-compliance investigator, reigniting the dispute between Gibson and Armadillo. The executives at Gibson averred that they believed the dispute had been settled by agreement years prior. Upon learning that the deal was never finalized, Gibson sought to negotiate a new royalty deal or settlement. These efforts stalled due to Gibson's filing of a voluntary petition for bankruptcy reorganization in May 2018. In November 2018, Gibson emerged from its Chapter 11 proceeding with new executive leadership that

unsuccessfully attempted to reach an agreement with Armadillo and Concordia.

### B. Procedural History

On May 14, 2019, Gibson filed the instant lawsuit against Armadillo and Concordia. It brought Lanham Act and Texas common law claims for willful trademark infringement, willful counterfeiting, false designation of origin, passing off, unjust enrichment, and unfair competition. It alleged that Armadillo infringed on four of its trademarked guitar body shapes, one trademarked guitar headstock shape, and two word marks (collectively, the "Gibson Trademarks"). Gibson asserted a claim for contributory trademark infringement under the Lanham Act against Concordia. It sought damages and a permanent injunction preventing further infringement and counterfeiting of the Gibson Trademarks. At the close of discovery, Armadillo moved for summary judgment, arguing that (1) all of Gibson's claims were barred by the doctrine of laches, (2) Gibson's marks were commercially weak or generic, (3) Armadillo's guitars were always sold with their own branded house marks, (4) Gibson failed to create a genuine dispute of material fact as to the existence of actual confusion between the alleged infringing products and Gibson's products, (5) consumers in the guitar market are accustomed to distinguishing different brands from each other, and (6) Armadillo's and Concordia's use of their own house marks on the allegedly counterfeit products demonstrates that Gibson's counterfeit claims must fail as a matter of law. The district court determined that Armadillo failed to demonstrate "that there is no material issue of fact as to these claims [that] entitled it to judgment as a matter of law."

A few days before trial, the district court made various evidentiary decisions from the parties' motions in limine, including Gibson's omnibus motion in limine. The omnibus motion's sixth motion ("MIL6") sought exclusion of all arguments and evidence relating to "advertisements or sales

of third-party guitars prior to 1992" due to their limited probative value and the risk of unfair prejudice and the presentation of cumulative evidence. Gibson further argued that evidence predating Armadillo's acquisition of the Dean brand in 1997 should be excluded due to hearsay and authentication issues, marginal relevance, and improper foundation. Thus, Gibson asserted that any third-party-use evidence must be restricted to the five-year period preceding Armadillo's and Concordia's acquisition of the rights to produce Dean guitars in 1997.

Armadillo and Concordia opposed MIL6, arguing that evidence of third-party use is highly relevant to genericness and that no legal authority supported a determination that third-party evidence predating a competitor's market entry is irrelevant to evaluating the strength of a mark. The district court partially granted MIL6, limiting Armadillo to evidence of third-party use from 1992 to the present, beginning five years before it acquired the Dean brand from Tropical Music (the "First Exclusion Order"). In its First Exclusion Order, the district court noted that evidence of third-party use—even where the evidence predates the time period at issue in the litigation—is relevant to the inquiry of determining whether a plaintiff's marks are generic or otherwise unprotectable. The district court quoted the Federal Circuit's decision in *Converse, Inc. v. International Trade Commission*, 909 F.3d 1110, 1121 (Fed. Cir. 2018) for the proposition that third-party use "older than five years should only be considered relevant if there is evidence that such uses were likely to have impacted consumers' perceptions of the mark as of the relevant date." Thus, the district court concluded that the probative value of evidence of third-party use before the 1990s was low and that the five-year cutoff date was reasonable.

Armadillo and Concordia objected to the determination, and the district court heard further oral argument as to the third-party-use evidence issue. As a result, the district court issued a Second Exclusion Order that

upheld its MIL6 determination because "concerns regarding judicial efficiency and possible confusion with the jury compel[led]" adherence "to a cut-off date." In Armadillo's formal offer of proof during trial, it referenced the fact that the excluded evidence of third-party use was relevant to the genericness of Gibson's claims.

The parties proceeded to trial on May 16, 2022. At trial, Armadillo moved for judgment as a matter of law before the close of the evidence. The district court denied the motion, concluding that it presented factual issues for the jury to decide. After a ten-day trial, the jury returned a verdict finding that: (1) Armadillo infringed on all of the Gibson Trademarks except for the Flying V word mark, (2) Armadillo marketed counterfeits of the Flying V body shape, the Explorer body shape, the SG body shape, and the "Hummingbird" word mark, (3) Gibson inexcusably delayed asserting its trademark rights in the dove-wing headstock, Flying V body shape, and Explorer body shape, thus barring recovery of damages under the doctrine of laches, (4) Armadillo and Concordia did not act with "unclean hands" in connection with their use of Gibson's marks, (5) Gibson suffered no actual damages from Armadillo's infringement, but was entitled to an award of $4,000 in statutory damages under its Lanham Act counterfeiting claim, (6) none of the Gibson body shapes' marks should be cancelled due to genericness, and (7) Gibson did not tortiously interfere with Armadillo's prospective business relationships. After supplemental briefing and before final judgment, the district court granted a permanent injunction against Armadillo and Concordia prohibiting the sale of the infringing products.

Armadillo and Concordia filed a motion for post-trial relief that offered a renewed motion for judgment as a matter of law and sought relief pursuant to Federal Rules of Civil Procedure 50(b), 59(a), 59(e), and 60(a)–(b). Armadillo and Concordia also moved for a new trial and vacatur of the permanent injunction based on the district court's erroneous granting of

MIL6. They further contended that Gibson's infringement and counterfeiting claims were not cognizable as a matter of law and lacked sufficient evidence to sustain the jury's verdict. The district court denied the motion for post-trial relief in its entirety. Armadillo and Concordia timely appealed.

## II. Standard of Review

"We review rulings on motions in limine for abuse of discretion." *Dial One of the Mid-South, Inc. v. BellSouth Telecomms., Inc.*, 269 F.3d 523, 528 (5th Cir. 2001) (citation omitted). To show an abuse of discretion, the appellant must demonstrate that the district court's evidentiary decision was "based on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir. 2003) (citation omitted). The appellant must also show prejudice from the grant or denial of a motion in limine. *Hesling v. CSX Transp., Inc.*, 396 F.3d 632, 643 (5th Cir. 2005) (citing *Buford v. Howe*, 10 F.3d 1184, 1188 (5th Cir. 1994)). Thus, a ruling that constitutes "an abuse of discretion in admitting or excluding evidence" will be affirmed "under the harmless error doctrine" unless "the [evidentiary] ruling affected substantial rights of the complaining party." *Bocanegra*, 320 F.3d at 584.

## III. Discussion

In addressing a motion in limine, the "trial court must weigh the evidence's contribution to the case against any potential prejudice or confusion." *F.D.I.C. v. Wheat*, 970 F.2d 124, 131 (5th Cir. 1992). Armadillo[1] contends that the district court abused its discretion by excluding decades of third-party-use evidence predating the registration of the Gibson Trademarks. It further asserts that the wholesale exclusion of this evidence

---

[1] Because Armadillo and Concordia jointly prosecute this appeal, the discussion section refers to them collectively as "Armadillo."

was not harmless error because the evidence was central to both Armadillo's counterclaim seeking cancellation of Gibson's marks and its main defense of genericness. For the reasons given below, we agree.

### A. Abuse of Discretion

Third-party-use evidence, or evidence demonstrating an alleged trademark's usage by parties other than the alleged infringer or rightsholder, is often relevant to show the genericness of a mark. *See Springboards to Educ., Inc. v. Houston Indep. Sch. Dist.*, 912 F.3d 805, 815 (5th Cir. 2019) ("Extensive third-party use of a term throughout the market suggests that consumers will not associate the junior mark's use with the senior mark user." (citation omitted)). A mark that is generic is not entitled to trademark protection. *See Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221, 227 (5th Cir. 2009).

In the proceedings below, the district court excluded wholesale third-party-use evidence central to Armadillo's genericness counterclaim and defense based on Federal Rule of Evidence 403 and *Converse*, 909 F.3d 1110. We examine each of these rationales in turn, beginning with the latter.

#### i. Converse

On appeal, Armadillo argues that the district court abused its discretion by relying on *Converse* to exclude third-party-use evidence predating 1992. Armadillo explains that *Converse* is inapposite because that case concerns secondary meaning and not genericness; thus, according to Armadillo, *Converse* cannot support the proposition that only certain temporal evidence is relevant to a genericness defense or counterclaim. In response, Gibson asserts that the district court appropriately relied on *Converse* in making its evidentiary ruling because secondary meaning and

genericness are closely interrelated issues.[2] It further contends, relying on *Converse*, that the five-year period predating the infringement is the "most logical measuring line" because "[c]onsumers are more likely to remember and be impacted in their perceptions by third-party uses within five years and less likely with respect to older uses." Gibson alternatively argues that 15 U.S.C. § 1064 bars Armadillo from introducing pre-1992 third-party-use evidence because Section 1064 provides that a petition to cancel a mark's registration may be filed only "[w]ithin five years from the date of the registration of the mark." We are unconvinced by Gibson's arguments.

In *Converse*, the court did not determine that third-party-use evidence older than five years before the alleged infringer's first use was irrelevant to a genericness analysis. *See* 909 F.3d at 1121. Rather, the Federal Circuit analyzed whether such evidence provides the best evidence to determine whether a mark has attained secondary meaning in the minds of consumers. *See id.* It determined that "[third-party] uses older than five years should only be considered relevant if there is evidence that such uses were likely to have impacted consumers' perceptions of the mark as of the relevant date." *Id.* Notably, the Federal Circuit remanded the case to the International Trade Commission to examine whether "[e]vidence older than th[e] five-year period" was relevant. *Id.* at 1122. With this added context, it is clear that *Converse* does not compel a strict five-year limitation of third-party-use evidence and, if anything, compels trial courts to examine whether older evidence is relevant.

---

[2] The parties' debate about secondary meaning versus genericness is beside the point because, as explained below, *Converse* did not impose any sort of categorical five-year limitation on admissible evidence—regardless of whether that evidence went to genericness or secondary meaning or both—and in fact instructed the lower court to consider whether evidence predating that five-year window is relevant. 909 F.3d at 1121–22.

No. 22-40587

*Converse* is instructive here because there is scant circuit authority addressing the relevance of third-party-use evidence dating back several decades.[3] *Converse* detailed that third-party-use evidence older than five years before the date of infringement is relevant "if there is evidence that such uses were likely to have impacted consumers' perceptions of the mark as of the relevant date." *Id.* at 1121.

On that question, in numerous cases, both inside and outside of the trademark-registration-challenge context, courts[4] and the TTAB have examined third-party-use evidence from decades *prior to* the five-year period before the alleged infringement. *See, e.g.*, *In re Jasmin Larian, LLC*, No. 87522459, 2022 WL 374410, at *7 (T.T.A.B. Jan. 19, 2022) (holding trademark generic where the "Examining Attorney [] presented substantial evidence that third parties have sold, offered for sale, and/or otherwise advertised, discussed or promoted identical or nearly identical handbags

---

[3] We have never confronted this precise issue of placing temporal limitations on the exclusion of third-party-use evidence based on relevancy to a claim of genericness. *Cf. Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.3d 252, 259–60 (5th Cir. 1980) (examining district court's discounting of decades of third-party uses in likelihood-of-confusion analysis where a mark's distinctiveness was conceded and genericness was not argued at a bench trial).

[4] *Malaco Leaf, AB v. Promotion in Motion, Inc.*, 287 F. Supp. 2d 355, 364–65 (S.D.N.Y. 2003) (holding that decades of unchecked third-party use of product design trade-dress for gummy candy fish was relevant to the genericness of the contested mark); *BellSouth Corp. v. White Directory Publishers, Inc.*, 42 F. Supp. 2d 598, 607–10, 610 n.5 (M.D.N.C. 1999) (determining that thirty years of third-party use of the "walking fingers" rendered the logo "an unprotectible mark"); *see generally Ale House Mgmt., Inc. v. Raleigh Ale House, Inc.*, 205 F.3d 137, 142 (4th Cir. 2000) ("Trade dress should be considered generic if 'well-known' or 'common' . . . or a 'common basic shape or design' . . .") (citation omitted); *Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 1000 (2d Cir. 1997) ("Yet trade dress protection has its limits. A trade dress that consists of the shape of a product that conforms to a well-established industry custom is generic and hence unprotected.").

prior to and concurrently with Applicant's use [beginning on January 27, 2013], *and that consumers have seen identical or nearly identical handbags emanating from parties other than Applicant since at least the 1940s* and recognize Applicant's mark as a common design") (emphasis added); *Stuart Spector Designs Ltd. v. Fender Musical Instruments Corp.*, 94 U.S.P.Q.2d 1549, 2009 WL 1017284, at *8 (T.T.A.B. 2009) (examining evidence of third-party-use of the contested guitar-body shapes dating back several decades).

Here, Armadillo argues that it was "prepared to present ample evidence that older third-party uses of the [body shapes] had affected consumer perceptions as of the date of either Armadillo's first alleged infringement or the dates of the body shapes' respective registrations." In its opposition to MIL6, Armadillo averred that testimony from both experts on both sides of this case would demonstrate how third-party uses from the 1960s to the present "have impacted consumer perceptions of Gibson's [body shapes] over the years such that those shapes are either generic or, at a minimum, incredibly weak."

Armadillo thus provided—or was prepared to provide—evidence that third-party uses of the body shapes prior to the five-year period fashioned in this case were relevant to the genericness inquiry. The district court did not even consider the relevance of the pre-1992 evidence in light of this showing. So, to the extent that its reliance on *Converse* would be appropriate, the district court misapplied it by not giving Armadillo the opportunity to demonstrate relevance. We conclude that the district court erred by excluding wholesale, without proper consideration or explanation, all pre-1992 third-party-use evidence. *See Bocanegra*, 320 F.3d at 584.

Gibson's interpretation of Sections 1064(1) and (3) does not save the district court's evidentiary ruling. Gibson argues that Armadillo is barred by statute from even arguing pre-1992 genericness at this point. Under Gibson's reading of the relevant statute, once five years have passed from a mark's

registration, a challenging party loses any opportunity to argue that the mark was generic *before* registration and, going forward, may argue only that the registered mark has *become* generic since registration. It is true that Section 1064 of the Lanham Act freely allows cancellation actions brought within five years of registration but limits the options for a party seeking such relief after that window passes. *See* 15 U.S.C. § 1064. But Gibson's construction conflicts with other provisions of the statute—namely, Section 1065(4), which provides that "no incontestable right shall be acquired in a mark which is the generic name for the goods or services or a portion thereof, for which it is registered." 15 U.S.C. § 1065(4). This provision notes no sort of time limitation for bringing a claim that a party's mark became generic before registration. To the contrary, we have held that "if it is determined that the mark is generic, it can *never* become incontestable." *Texas Pig Stands, Inc. v. Hard Rock Café Int'l, Inc.*, 951 F.2d 684, 689 n.5 (5th Cir. 1992) (emphasis added). Thus, the Lanham Act allows for a petition filed more than five years after registration to cancel a trademark on the theory that the mark was generic *prior* to registration. Reading these provisions together demonstrates that Section 1064 does not stretch so far as to *per se* bar third-party-use evidence predating five years before the first alleged infringing use. Because the district court excluded wholesale the pre-1992 evidence without examining the possible relevance of that evidence, it abused its discretion.

### ii. Rule 403

In its Second Exclusion Order, the district court referenced Rule 403 as a basis for the wholesale exclusion. Rule 403 provides that "[t]he court may exclude relevant evidence if its probative value is *substantially outweighed* by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403 (emphasis added). In MIL6, Gibson sought the wholesale exclusion of third-party-use evidence

prior to 1992 on the grounds that the admission of such evidence would disserve judicial economy. The district court agreed. It reasoned that "concerns regarding judicial efficiency and possible confusion with the jury compel[led]" adherence "to a cut-off date."

We hold that this determination is inconsistent not only with the district court's previous holdings in this case addressing Armadillo's genericness defense but also with the principle that exclusion of probative evidence under Rule 403 is "an extraordinary remedy that must be used sparingly." *Herrington v. Hiller*, 883 F.2d 411, 414 (5th Cir. 1989) (citation omitted). Such a sweeping use of Rule 403 conflicts with the principle that pretrial motions seeking the wholesale exclusion of a class of relevant evidence require careful review. *See Kelly v. Boeing Petroleum Servs.*, 61 F.3d 350, 357 & n.7 (5th Cir. 1995); *Jackson v. Firestone Tire & Rubber Co.*, 788 F.2d 1070, 1084 (5th Cir. 1986). While Rule 403 requires a district court to balance the proffered evidence with the risk of countervailing concerns, it provides no basis for the complete exclusion of all third-party-use evidence prior to 1992. Doing so caused substantial prejudice to Armadillo as the party seeking admission of third-party-use evidence critical to its primary defense. The district court determined that Armadillo's third-party-use evidence was highly relevant at several points during discovery. For instance, it denied a *Daubert* motion to exclude Appellant's music history expert because it determined that his "opinion aids the jury by providing insight into Gibson's trademarks and *relevant third-party usage of similar guitar shapes.*" Thus, we hold that the district court abused its discretion in excluding wholesale all third-party-use evidence predating 1992.

### B. Harmless Error

As noted above, an abuse of discretion in an evidentiary ruling will not be overturned absent a showing of substantial prejudice resulting from that determination. *See Hesling*, 396 F.3d at 643. In *Bocanegra v. Vicmar Services,*

*Inc.*, a pedestrian was fatally injured when he was struck by a streetsweeper on the median of a highway. 320 F.3d at 583. On the eve of trial, the pedestrian's estate sought to introduce evidence demonstrating that the driver of the streetsweeper was impaired by the use of marijuana a few hours prior to the fatal collision. *Id.* Citing Rule 403 and the *Daubert* standard, the district court granted the driver's motion in limine and excluded the driver's expert testimony and an admission from the driver that he had smoked marijuana a few hours before the incident. *Id.* at 583–84. The jury returned a take-nothing verdict, and the pedestrian's estate appealed. *Id.* On appeal, this court determined that the district court's "reliance on Rule 403 as another basis to exclude [the relevant expert] testimony concerning cognitive impairment resulting from [the driver's] ingestion of marijuana" constituted an abuse of discretion. *Id.* at 590. This court further held that the error affected the pedestrian's substantial rights because "the jury was not presented with a complete picture of what happened on the night in question." *Id.* This court concluded that the pedestrian's estate was left with no means of countering the driver's argument that he "reacted reasonably and did the best he could under the circumstances." *Id.*

Just as in *Bocanegra*, the jury in this case "was not presented with a complete picture of what happened" prior to the alleged period of infringement and heard little to no evidence supporting Armadillo's theory that the Gibson Trademarks were generic at the time of their registration. *See id.* Thus, it is apparent that the wholesale exclusion of all pre-1992 third-party-use evidence affected Armadillo's substantial rights. At several periods in this litigation, the district court agreed that third-party-use evidence is highly relevant to the genericness analysis and the likelihood of confusion factors. For instance, the district court previously held that "third-party sales data are at the core of Armadillo's argument that Gibson's marks are generic" and that such evidence "is therefore necessary to Armadillo's

defense." The trial court also acknowledged that Fifth Circuit precedent says "that evidence of the state of the market, even where that evidence 'predates' the time period relevant to the litigation, is relevant to whether the marks have become generic." In granting MIL6 pursuant to Rule 403, the district court contradicted its prior evaluations of the evidence with only a few lines of text in its Second Exclusion Order.

Armadillo's genericness claim is central to its case because "[g]eneric marks . . . are categorically excluded from [trademark] protection." *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 241–42 (5th Cir. 2010). Put another way, Gibson would not sustain actual or statutory damages if Armadillo were to prevail on its genericness counterclaim.[5] In its offer of proof at trial, Armadillo consistently reiterated that the excluded evidence was relevant to its genericness defense and counterclaim. This claim cannot be divorced from the rest of the issues on appeal, and the appropriate remedy to this evidentiary error is to order a new trial. *See Brooks v. Great Lakes Dredge-Dock Co.*, 754 F.2d 539, 540 (5th Cir. 1985) ("Courts must order a complete retrial of issues 'unless it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice." (quoting *Gasoline Prods. v. Champlin Ref.*, 283 U.S. 494, 500 (1931)). We conclude that the district court's abuse of discretion affected Armadillo's substantial rights to put on its primary defense to the infringement and counterfeiting claims against it, and thus, a new trial must occur. *See id.*

---

[5] Armadillo also raised the equitable defense of laches. This court has determined that "a finding of laches alone" may limit the availability of injunctive relief for a trademark-infringement claim. *See Conan Props., Inc. v. Conans Pizza, Inc.*, 752 F.2d 145, 152 (5th Cir. 1985). From this, it can be said that Armadillo's primary defense was genericness, and that the district court's partial granting of MIL6 severely limited Armadillo's ability to support its main theory of the case.

No. 22-40587

## IV. Conclusion

In sum, we hold that the district court abused its discretion in excluding wholesale all pre-1992 evidence of third-party use of the Gibson Trademarks pursuant to Rule 403. Rule 403's ambit does not contemplate broad, case-dispositive exclusions that severely restrict a party's ability to advance its primary defense to a cause of action. Thus, we REVERSE and REMAND with instructions to hold a new trial.